*So Ordered.* [signature] 3-12-09

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>UTAH 7000, L.L.C., et al.,<br><br>Debtors.<br><br>Address: 8758 N. Promontory Ranch Road<br>Park City, UT 84098<br><br>Tax ID Numbers: 47-0920837, 75-3148710, 86-0986819, 86-0991146, 86-1023965, and 47-0920840 | Case No. 08-21869<br><br>Jointly Administered with Case Nos. 08-21870, 08-21872, 08-22075, 08-22077, and 08-27712<br><br>Chapter 11<br>Hearing Date/Time/Location:<br><br>March 12, 2009, 9:00 a.m.<br>Courtroom 341<br>Frank E. Moss U.S. Courthouse<br>350 South Main Street, 3rd Floor<br>Salt Lake City, Utah |

RECEIVED MAR 1 2 2009 US BANKRUPTCY COURT DISTRICT OF UTAH

**SIDLEY AUSTIN LLP**
Richard W. Havel (Cal. Bar No. 52922)
Elizabeth W. Walker (Cal. Bar No. 113545)
555 West Fifth Street, Suite 4000
Los Angeles, California 90013-1010
Telephone: (213) 896-6000
Facsimile: (213) 896-6600

**DORSEY & WHITNEY LLP**
Annette W. Jarvis (Utah Bar No. 1649)
Peggy Hunt (Utah Bar No. 6060)
136 South Main Street, Suite 1000
Salt Lake City, Utah 84101-1685
Telephone: (801) 933-8933
Facsimile: (801) 933-7373

Counsel for Credit Suisse, Cayman Islands Branch, as First Lien Agent

**STUTMAN, TREISTER & GLATT PC**
Ralph R. Mabey (Utah Bar No. 2036)
K. John Shaffer (Cal. Bar No. 153729)
Eve H. Karasik (Cal Bar No. 155356)
1901 Avenue of the Stars, 12th Floor
Los Angeles, California 90067
Telephone: (310) 228-5600
Facsimile: (310) 228-5788

**STOEL RIVES LLP**
Danny C. Kelly (Utah Bar No. 1788)
201 S. Main Street, #1100
Salt Lake City, Utah 84111
Telephone: (801) 578-6979
Facsimile: (801) 578-6999

Reorganization Counsel for the Debtors and Debtors in Possession

## FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF ORDER CONFIRMING FOURTH AMENDED JOINT PLAN OF REORGANIZATION (DATED FEBRUARY 9, 2009) AS SUPPLEMENTED AND AS MODIFIED

WHEREAS, Utah 7000, L.L.C, Utah 7000 Cabins, L.L.C, Utah 7000 Capital, L.L.C., Utah 7000 Development, L.L.C., Utah 7000 Realty, L.L.C., and Pivotal Promontory TRC, L.L.C. (collectively, the "Debtors") and Credit Suisse, Cayman Islands branch, in its capacity as administrative and collateral agent (the "First Lien Agent," and together with the Debtors, the "Plan Proponents") as "proponents of the plan" within the meaning of section 1129 of title 11, United States Code (the "Bankruptcy Code"), filed the "Fourth Amended Joint Plan of Reorganization Proposed by the Debtors and First Lien Agent (Dated February 9, 2009)" (the "Plan") and the "Disclosure Statement to Accompany Fourth Amended Joint Plan of Reorganization Proposed by the Debtors and First Lien Agent (Dated February 9, 2009) ("Disclosure Statement");[1] and

WHEREAS, on February 9, 2009, the Court entered its "Order Granting Amended and Restated Motion for Order: (1) Approving Disclosure Statement; (2) Approving Solicitation Procedures, Forms of Ballots, and Manner of Notice of Debtors' and First Lien Agent's Plan of Reorganization; and (3) Fixing the Date, Time and Place for the Confirmation Hearing and the Deadline for Filing Objections Thereto and to the Assumption or Assignment of Assumed

---

[1] Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in the Plan, a copy of which as confirmed by the Bankruptcy Court is annexed hereto as Exhibit "A." Any term used in the Plan, the Confirmation Order or these Findings that is not defined in the Plan, the Confirmation Order or these Findings, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

Obligations, as Supplemented" [Docket No. 1595] (the "Solicitation Order") that, among other things, (a) approved the Disclosure Statement under Bankruptcy Code section 1125 and Rule 3017 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (b) established March 12, 2009, as the date for the commencement of the hearing to consider confirmation of the Plan (the "Confirmation Hearing"), (c) approved the form and method of notice of the Confirmation Hearing (the "Confirmation Hearing Notice"), and (d) established certain procedures for soliciting and tabulating votes with respect to the Plan; and

WHEREAS, (a) the Confirmation Hearing Notice, (b) the Plan, (c) the Disclosure Statement, (d) a letter from the Committee, (e) a letter from the Current Equity Owners, (f) a letter from the Second Lien Agent and, (g) with respect to those creditors in classes entitled to vote under the Plan and Solicitation Order, a ballot and return envelope (such ballot and envelope being referred to as a "Ballot"), were transmitted as set forth in the Affidavits of Service of Rosemarie Serrette and James H. Myers of BMC Group, sworn to on February 26, 2009 [Docket No. 1651] and March 4, 2009 [Docket No.1675] (the "BMC Affidavits"); and

WHEREAS, the Plan Proponents filed the following affidavits of publication attesting to the fact that the Confirmation Hearing Notice was published in accordance with the Solicitation Order: (a) the Affidavit of Publication (The Salt Lake Tribune) from February 15, 2009 through February 19, 2009 [Docket No. 1645], and (b) the Affidavit Re: Publication by (The Park Record) on February 14, 18 and 21, 2009 [Docket No. 1670] (the "Publication Affidavits"); and

WHEREAS, on March 3, 2009, the Plan Proponents filed: (a) the Plan Supplement with respect to the Plan [Docket No. 1664] (as amended by the Amended Supplement (the "Amended

Plan Supplement") on March 4, 2009 [Docket No. 1668]) (as amended, the "Plan Supplement"), (b) their memorandum of law in support of confirmation of the Plan [Docket No. 1657] (the "Confirmation Memorandum"), and (c) declarations and/or expert reports of J. Philip Cook, Karl Polen, Brian J. Griffith, and Philip Carlucci [Docket Nos. 1658, 1659, 1660 and 1663] (the "Supporting Declarations"); and

WHEREAS, on March 11, 2008, the Plan Proponents filed the Declaration of Rosemarie J. Serrette on Behalf of BMC Group, Inc., Balloting Tabulator, Regarding the Solicitation and Tabulation of Votes with Respect To The Fourth Amended Joint Plan Of Reorganization Proposed By The Debtors And The First Lien Agent Dated February 9, 2009 [Docket No. 1690] attesting and certifying the method and results of the ballot tabulation for the Classes of Claims (Classes 3, 4, and 5), entitled to vote to accept or reject the Plan (as may be supplemented, corrected, or amended, the "Voting Report"); and

WHEREAS, on or before the objection deadline of March 10, 2009 at 12:00 p.m. Mountain Time, or such other time approved by the Court, five objections to confirmation of the Plan were filed with the Court and served in the manner directed in the Confirmation Hearing Notice as follows: (a) Limited Objection by Linsey et al. to Assumption of Executory Contract or Other Obligation [Docket No. 1667], (b) the Objection to Confirmation of Debtors' Fourth Amended Joint Plan of Reorganization filed by Summit County [Docket No. 1681] ("Summit County Objection"), (c) the Objection by Nevi Brooke et. al. to Fourth Amended Joint Plan of Reorganization Proposed by the Debtors and First Lien Agent Dated February 9, 2009 [Docket No. 1683], (d) Objection by Wade Peabody et al. to Fourth Amended Joint Plan of

Reorganization Proposed by Debtors and First Lien Agent Dated February 9, 2009 [Docket No. 1684], and (e) Limited Objection by Ames Construction, Inc. to Assumption of Executory Contract Under Debtors' Fourth Amended Joint Plan of Reorganization [Docket No. 1685] (with *(the "Ames Objection")* the exception of the Summit Count Objection, these papers being collectively referred to as the "Objections"); and

WHEREAS, Summit County has withdrawn the Summit County Objection [Docket No. 1682];

WHEREAS, on March 11, 2009, the Debtors filed a Response To Objections To The Assumption Of Contracts Pursuant To The Fourth Amended Joint Plan Of Reorganization Proposed By The Debtors And The First Lien Agent (Dated February 9, 2009) [Docket No. 1695] (the "Response"), responding to the Objections; and

WHEREAS, the Confirmation Hearing commenced on March 12, 2009, at which time evidence was presented and arguments were made; and

WHEREAS, the Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the Clerk of this Court including, without limitation, all pleadings and other documents filed, all orders entered, and evidence and argument made, proffered, or adduced at the hearings held before the Court during the pendency of the Chapter 11 Cases; and

NOW, THEREFORE, based the foregoing and upon the Court's review of the Voting Report, the Confirmation Memorandum, the Plan Supplement, the Supporting Declarations, the BMC Affidavits, the Publication Affidavits, and the Response filed in support of confirmation; and upon (a) all the evidence proffered and/or adduced at, memoranda and Objections filed in

connection with, and arguments of counsel made at, the Confirmation Hearing, (b) the entire record of these Chapter 11 Cases, and (c) the applicable law, and after due deliberation thereon and good cause appearing therefor the Court concurrently enters herewith its "Order Confirming Fourth Amended Joint Plan of Reorganization (Dated February 9, 2009) as Supplemented and as Modified" (the "Confirmation Order"). In support of the Confirmation Order, the Court hereby enters the following Findings of Fact and Conclusions of Law, as supplemented by any findings of fact and conclusions of law stated orally and reported in open court on the record at the Confirmation Hearing (which are incorporated herein), pursuant to Bankruptcy Rules 7052 and 9014:[2]

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

A.      This Court has jurisdiction over the Chapter 11 Cases pursuant to sections 157 and 1334 of title 28 of the United States Code. Venue is proper pursuant to sections 1408 and 1409 of title 28 of the United States Code. Confirmation of the Plan is a core proceeding pursuant to section 157(b)(2)(L) of title 28 of the United States Code, and this Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

B.      Out of the five Objections, one, the Summit County Objection, has been formally withdrawn. ~~The~~ Three of the remaining Objections either have been resolved and/or have been withdrawn or partially resolved on the terms and conditions described in the Response and/or on the record of

---

[2]  Pursuant to Bankruptcy Rule 7052, findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, when appropriate.

the Confirmation Hearing (collectively, the "Resolved Objections"), and the Confirmation Order incorporates agreements made in conjunction with the Resolved Objections. To the extent that any of the Objections *(with the exception of the Ames Objection)* are not Resolved Objections, the Objections are without merit and are overruled. Furthermore, to the extent that any objections to the confirmation of the Plan are not expressly listed in these Findings, they were not timely filed in accordance with the Court's Solicitation Order and, therefore, are stricken from the record.

C. The Plan and Disclosure Statement and related letters in support thereof, the Ballots, and the Confirmation Hearing Notice, which were transmitted and served as set forth in the BMC Affidavits, were transmitted and served in compliance with the Solicitation Order, the applicable Bankruptcy Rules (including without limitation Bankruptcy Rules 2002, 2017, 3018 and 3019) and the applicable Local Rules of this Court, and such transmittal and service were adequate and sufficient, and no other or further notice is or shall be required.

D. Votes to accept and reject the Plan have been solicited and tabulated fairly, in good faith, and in a manner consistent with the Bankruptcy Code (including sections 1125 and 1126), the Bankruptcy Rules (including Bankruptcy Rules 3017 and 3018), the Solicitation Order, and all other applicable laws, rules, regulations and industry practice, as reflected in BMC Affidavits, the Publication Affidavits, the Voting Report, and the Declarations of Karl Polen and Philip Carlucci. All Persons, including the Plan Proponents, have acted in good faith with respect to the solicitation of votes on the Plan and thus are entitled to the protections of Bankruptcy Code section 1125(e).

E.     The Plan Proponents have the burden of proving the elements of sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of evidence.

F.     **11 U.S.C. § 1129(a).**  The Plan Proponents have met their burden of establishing that the Plan satisfies all of the requirements of the Bankruptcy Code section 1129(a) as follows:

1.     **11 U.S.C. § 1129(a)(1).**  The Plan complies with the applicable provisions of the Bankruptcy Code, including Bankruptcy Code sections 1122 and 1123, thereby satisfying section 1129(a)(l) of the Bankruptcy Code.  The applicable provisions of sections 1122 and 1123 are as follows:

(a)     Section 1122(a).  The Plan designates 8 Classes of Claims or Equity Interests.  The Claims or Equity Interests placed in each Class are substantially similar to other Claims or Equity Interests, as the case may be, in each such Class. Accordingly, the Plan satisfies section 1122(a) of the Bankruptcy Code.

(b)     Section 1122(b).  In accordance with section 1122(b) of the Bankruptcy Code, Class 6 separately classifies for administrative convenience all Convenience Claims.  Separate classification of the Convenience Claims is in compliance with section 1122(b), and the Convenience Claim Election is reasonable.

(c)     11 U.S.C. § 1123(a)(1).  The Plan designates 8 Class of Claims or Equity Interests in accordance with section 1122 of the Bankruptcy Code, and Administrative Expense Claims and Priority Tax Claims are not classified.  Accordingly, section 1123(a)(1) of the Bankruptcy Code is satisfied.

(d)     11 U.S.C. § 1123(a)(2). The Plan specifies that Classes 1, 2 and 6 are unimpaired under the Plan, thereby satisfying section 1123(a)(2) of the Bankruptcy Code.

(e)     11 U.S.C. § 1123(a)(3). The Plan designates all Classes of Claims or Equity Interests, other than Classes 1, 2 and 6, as impaired and specifies the treatment of Claims and Equity Interests in those impaired Classes, thereby satisfying section 1123(a)(3) of the Bankruptcy Code.

(f)     11 U.S.C. § 1123(a)(4). The Plan provides for the same treatment for each Claim or Equity Interest in each respective Class unless the Holder of a particular Claim or Equity Interest has agreed to a less favorable treatment of such Claim or Equity Interest, thereby satisfying section 1123(a)(4) of the Bankruptcy Code.

(g)     11 U.S.C. § 1123(a)(5). Article VI of the Plan and various other provisions of the Plan, including those incorporated through the Plan Supplement, provide adequate and proper alternative means for the Plan's implementation, thereby satisfying section 1123(a)(5) of the Bankruptcy Code.

(h)     11 U.S.C. § 1123(a)(6). In accordance with Article VI, Section 6.2 of the Plan, the Amended LLC Agreements for the Reorganized Debtors prohibit the issuance of non-voting equity securities. Thus, the requirements of section 1123(a)(6) of the Bankruptcy Code are satisfied.

(i)     11 U.S.C. § 1123(a)(7). Article VI, Section 6.5 of the Plan and the Plan Supplement, contain provisions with respect to the manner of selection of directors

of NewCo that are consistent with the interests of creditors, equity security holders, and public policy in accordance with section 1123(a)(7) of the Bankruptcy Code.

(j)     11 U.S.C. § 1123(b)(1).   Pursuant to section 1123(b)(1) of the Bankruptcy Code, the Plan impairs or leaves unimpaired Classes of Claims or Equity Interests.

(k)     11 U.S.C. § 1123(b)(2).   As contemplated under section 1123(b)(2) of the Bankruptcy Code, the Plan provides for the assumption, rejection and assignment of executory contracts and unexpired leases, and the assumption, rejection and assignment of such executory contracts and unexpired leases is proper and appropriate under section 365 of the Bankruptcy Code.

(l)     11 U.S.C. § 1123(b)(3)(A).   Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code, the Plan appropriately provides for the settlement and/or adjustment of Claims belonging to the Debtors and/or to the Estates.   Based on the uncontroverted, persuasive and credible evidence proffered or adduced at the Confirmation Hearing, the compromises and settlements giving rise, in particular, to the Equity Settlement Payment, establish that such settlements and/or adjustment of Claims have been properly noticed and comply with all applicable law, including section 105 of the Bankruptcy Code and Bankruptcy Rule 9019.   Furthermore, the uncontrovered evidence establishes that the release and exculpation clauses set forth in Article VIII, Sections 8.5, 8.6 and 8.8 of the Plan are (i) integral to the settlement and/or adjustment of Claims provided for in the Plan, (ii) are being given for fair consideration, (iii) are

necessary to the Debtors' reorganization, and/or (iv) are permissible under Bankruptcy Code section 1123 and all applicable law.

(m) <u>11 U.S.C. § 1123(b)(3)(B).</u> As contemplated under section 1123(b)(3)(B) of the Bankruptcy Code, where Disputed Claims, Avoidance Actions and Retained Actions have not been settled and/or released, the Plan appropriately provides for the retention and enforcement by the Reorganized Debtors and/or the Committee of such Disputed Claims, Avoidance Actions and/or Retained Actions.

(n) <u>11 U.S.C. § 1123(b)(4).</u> Alternative B to the Plan provides, as an alternative means for implementation of the Plan, for the sale of all or substantially all for the property of the estate as contemplated under section 1123(b)(4) of the Bankruptcy Code, and this alternative means for implementation of the Plan is appropriate and not in any way forbidden by law.

(o) <u>11 U.S.C. § 1123(b)(6).</u> The Plan complies with section 1123(b)(6) of the Bankruptcy Code because its provisions are appropriate and not inconsistent with applicable law.

2. **<u>11 U.S.C. § 1129(a)(2)</u>.** The Plan Proponents have complied with all of the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(2) of the Bankruptcy Code. Specifically:

(a) The Debtors are qualified to be chapter 11 debtors under section 109 of the Bankruptcy Code.

(b)     The Debtors have complied with applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of this Court.

(c)     The Plan Proponents have complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Solicitation Order in transmitting the Plan, the Disclosure Statement, the Ballots, and related documents and notices and in soliciting and tabulating votes on the Plan.

3.     **11 U.S.C. § 1129(a)(3).** The Plan Proponents have proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code. The Plan Proponents' good faith is evident from the facts and records of these Chapter 11 Cases, the Disclosure Statement and the hearing thereon, and the record of the Confirmation Hearing and other proceedings held in these Chapter 11 Cases. The Plan is the product of significant and arms length negotiations by and between numerous divergent constituencies, and it was proposed with the legitimate and honest purpose of maximizing the value of the Debtors' Estates and to effectuate a successful reorganization of the Debtors.

4.     **11 U.S.C. § 1129(a)(4).** Any payment made or to be made by any of the Debtors for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, this Court as reasonable, thereby satisfying section 1129(a)(4) of the Bankruptcy Code.

5.    **11 U.S.C. § 1129(a)(5).**  The Plan Proponents have complied with section 1129(a)(5) of the Bankruptcy Code.  The identity and affiliations of those Persons currently proposed to serve as initial directors or officers of NewCo and/or the Reorganized Debtors after confirmation of the Plan have been disclosed at the Confirmation Hearing, and any additions or changes to the directors or officers will be pursuant to NewCo's company agreement and applicable governance documents and in accordance with applicable state and federal law.    The appointment to, or continuance in, such offices of such Persons is consistent with the interests of Holders of Claims against and Equity Interests in the Debtors and with public policy.  The identity of any insider that will be employed or retained by NewCo and/or the Reorganized Debtors and the nature of such insider's compensation have been fully disclosed in the Plan Supplement.

6.    **11 U.S.C. § 1129(a)(6).**  The Plan does not provide for any changes in rates established or approved by, or otherwise subject to, any governmental regulatory commission.  Thus, section 1129(a)(6) of the Bankruptcy Code is not applicable in these Chapter 11 Cases.

7.    **11 U.S.C. § 1129(a)(7).**   The Plan satisfies section 1129(a)(7) of the Bankruptcy Code.  The liquidation analyses provided in the Disclosure Statement and other evidence proffered or adduced at the Confirmation Hearing (a) are persuasive and credible, (b) have not been controverted by other evidence, and (c) establish that each Holder of a Claim or Equity Interest in an impaired Class either (i) has accepted the Plan,

or (ii) will receive or retain under the Plan, on account of such Claim or Equity Interest, property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

8.    **11 U.S.C. § 1129(a)(8)**.    Except with respect to Classes 7 and 8 (the "Deemed Rejecting Classes"), the Plan complies with section 1129(a)(8) of the Bankruptcy Code because each of the remaining Classes of Claims or Equity Interests in the Plan, (a) has accepted the Plan, or (b) is not impaired under the Plan.

(a)    Classes 1, 2 and 6 are not impaired and, therefore, such Classes are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.

(b)    Classes 3, 4 and 5 have voted to accept the Plan in accordance with section 1126(c) and (d) of the Bankruptcy Code.

(c)    Classes 7 and 8, the Deemed Rejecting Classes, are not entitled to receive or retain any property under the Plan and, therefore, are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.    Although section 1129(a)(8) cannot be satisfied with respect to the Deemed Rejecting Classes as a matter of law, the Plan nonetheless is confirmable because, as discussed below, the Plan satisfies sections 1129(a)(10) and 1129(b) of the Bankruptcy Code with respect to the Deemed Rejecting Classes.

9. **11 U.S.C. § 1129(a)(9).** The treatment of Administrative Expense Claims, including Professional Compensation Claims, Claims for statutory fees and charges, Priority Non-Tax Claims, and Priority Tax Claims under the Plan satisfies the requirements of Bankruptcy Code section 1129(a)(9).

10. **11 U.S.C. § 1129(a)(10).** The Plan satisfies section 1129(a)(10) of the Bankruptcy Code because, as discussed in paragraph 8, above, at least one Class of Claims that is impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any insider.

11. **11 U.S.C. § 1129(a)(11).** The Plan complies with section 1129(a)(11) of the Bankruptcy Code because the evidence proffered, adduced, or presented at the Confirmation Hearing (a) is persuasive and credible, (b) has not been controverted by other evidence, and (c) establishes that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtors or any successor.

12. **11 U.S.C. § 1129(a)(12).** All fees payable under section 1930 of title 28 of the United States Code, as determined by this Court, have been paid or will be paid pursuant to Article XI, Section 11.8 of the Plan, thus satisfying the requirements of section 1129(a)(12) of the Bankruptcy Code.

13. **11 U.S.C. § 1129(a)(13).** The Plan satisfies the requirements of Bankruptcy Code section 1129(a)(13) because the Debtors are not subject to any retiree benefits as defined in Bankruptcy Code section 1114.

14.     **11 U.S.C. § 1129(a)(14).** The requirements of Bankruptcy Code section 1129(a)(14), which mandate the payment of domestic support obligations, are inapplicable to these business Debtors.

15.     **11 U.S.C. § 1129(a)(15).** The requirements of Bankruptcy Code section 1129(a)(15), which only applies to cases where the debtor is an individual, are inapplicable to these business Debtors.

16.     **11 U.S.C. § 1129(a)(16).** The requirements of Bankruptcy Code section 1129(a)(16), which only applies to "the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust[,]" are inapplicable because each of the Debtors is a moneyed business or commercial corporation.

G.     **11 U.S.C. § 1129(b).** The Plan Proponents have met their burden of establishing that the Plan satisfies Bankruptcy Code section 1129(b) with respect to the Deemed Rejecting Classes (Classes 7 and 8), the only Classes that are impaired and rejecting Classes under the Plan, as follows:

1.     As set forth above, all of the applicable requirements of Bankruptcy Code section 1129(a), other than paragraph (8) are met with respect to the Plan.

2.     Based upon the evidence proffered, adduced, or presented by the Plan Proponents at the Confirmation Hearing, the Plan does not discriminate unfairly with respect to the Deemed Rejecting Classes as required under section 1129(b)(1) of the Bankruptcy Code.

3.      Based upon the evidence proffered, adduced, or presented by the Plan Proponents at the Confirmation Hearing, the Plan is "fair and equitable" with respect to the Deemed Rejecting Classes, as required by section 1129(b)(1) of the Bankruptcy Code for the following reasons:

(a)     Class 7.  The Plan is "fair and equitable" with respect to Class 7, Intercompany Claims, under section 1129(b)(2)(B)(ii) of the Bankruptcy Code because the only Class junior to that of Class 7 is Class 8, which is comprised of Equity Interests. Class 8 will neither receive nor retain any property under the Plan and, accordingly, no Class junior in priority to Class 7 will receive or retain any property under the Plan on account of its Claims or Equity Interests.

(b)     Class 8.  The Plan is "fair and equitable" with respect to the Holders of Equity Interests in Class 8 under section 1129(b)(2)(C)(i) of the Bankruptcy Code because existing Equity Interests have no value and, therefore, by receiving no Distribution and retaining no property, the Holders of Equity Interests are receiving the value of their Equity Interests.

H.      There has been no request by a governmental unit that the Plan not be confirmed because the principal purpose of the Plan is the avoidance of taxes or avoidance of the application of section 5 of the Securities Act of 1933 (15 U.S.C. § 77e).

I.      The form of the documents in the Plan Supplement (as amended), including the Term Sheet for Certain Terms of the NewCo LLC Agreement, the Form of NewCo Certificate of

Formation, the Form of Amended Operating Agreement for each of the Reorganized Debtors and the Form of New Warrants, are appropriate and necessary for the implementation of the Plan.

J.      All of the conditions precedent to confirmation of the Plan described in Article IX, Section 9.1 of the Plan have been satisfied.

K.      Based on the uncontroverted, persuasive and credible evidence, the agreements, transactions and transfers authorized herein and by the Confirmation Order are fair, equitable and reasonable, are entered into in good faith, are in the best interests of the Debtors, their creditors and the Estates, and provide adequate means for implementing the Plan.

L.      Based on the uncontroverted, persuasive and credible evidence, the settlements and compromises by and between the Current Equity Owners, the Debtors, the Committee, the First Lien Agent and the Second Lien Agent that form the basis of the Equity Settlement Payment as provided for in Article VIII, Section 8.7 of the Plan and all corresponding releases are fair, reasonable, and in the best interests of the Debtors' Estates. As set forth above, the settlements and compromises are appropriate under sections 105, 1123(b)(3)(A) and 1129(a)(1) of the Bankruptcy Code and Bankruptcy Rule 9019. No First Lien Lender or Second Lien Lender elected to opt out of the release provisions in Article VIII, Section 8.6 of the Plan. Therefore, (a) all First Lien Lenders and the First Lien Agent shall constitute Releasing First Lien Lenders as defined in Article VIII, Section 8.6 of the Plan, and (b) all Second Lien Lenders and the Second Lien Agent shall constitute Releasing Second Lien Lenders as defined in Article VIII, Section 8.6 of the Plan, and as such will be bound by the release provisions in Article VIII, Section 8.6 of the Plan, subject to and conditioned on, with respect to the release of the Current

Equity Owners Parties, the Current Equity Owners making the Equity Settlement Payment in accordance with Article VIII, Section 8.7 of the Plan, and the turnover of the Equity Settlement Payment to the Reorganized Debtors on the Effective Date.

M.     Based on the uncontroverted, persuasive and credible evidence, the settlements and releases by and between the Releasing First Lien Lenders and the Releasing Second Lien Lenders as provided for in Article VIII, Section 8.6 of the Plan are fair, reasonable, and in the best interests of the Debtors' Estates. No elections to opt out of the releases were filed by any First Lien Lender or Second Lien Lender. Accordingly, the First Lien Agent and all First Lien Lenders shall constitute Releasing First Lien Lenders as defined in Article VIII, Section 8.6 of the Plan, and the Second Lien Agent and all Second Lien Lenders shall constitute Releasing Second Lien Lenders as defined in Article VIII, Section 8.6 of the Plan, and as such will be bound by their mutual releases with each other contained in the second paragraph of Article VIII, Section 8.6 of the Plan.

N.     The injunctions, releases and limitations on liability set forth in Article VIII of the Plan are fair and equitable, are given for valuable consideration, were properly noticed to Holders of Claims and Equity Interests and other interested parties in accordance with the requirements of due process and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules, and are in the best interests of the Debtors and their Estates.

O.     As set forth in Article VIII, Section 8.4(A) of the Plan, the Debtors are entitled to a discharge under section 1141(d) of the Bankruptcy Code, and as of the Effective Date of the

Plan, the injunction set forth in section 1141(c) of the Bankruptcy Code and in Article VIII, Section 8.4(B) of the Plan shall apply.

P.      The Court's retention of jurisdiction as set forth in Article X of the Plan is appropriate and comports with the parameters set forth in section 1142 of the Bankruptcy Code and section 157 of title 28 of the United States Code.

Q.      Based on the foregoing, notwithstanding the Plan Proponents' failure to satisfy section 1129(a)(8) of the Bankruptcy Code with respect to the Deemed Rejecting Classes, the Plan must be confirmed because the Plan Proponents have met their burden of showing that the requirements of section 1129(a) have been met and that section 1129(b) has been met with respect to the Deemed Rejecting Classes.   Accordingly, pursuant to section 1129 of the Bankruptcy Code, this Court must and shall enter the Confirmation Order.

R.      The provisions of the Plan, including all documents incorporated as part of the Plan, these Finding and the Confirmation Order shall bind all parties bound to the confirmed Plan pursuant to section 1141 of the Bankruptcy Code, including the following: (1) the Debtors and their Estates, (2) all Holders of Claims against the Debtors, (3) all Holders of Equity Interests in the Debtors, (4) all Current Equity Owners, (5) all parties in interest, including the Committee, (6) to the extent applicable, the Reorganized Debtors, NewCo and/or any Acquirer, and (7) any Holder of an Administrative Expense Claim or Claim against or any Equity Interest in any of the Debtors, including all federal, state and local governmental entities and fiscal intermediaries thereof, whether or not (a) the Administrative Expense Claim, Claim or Equity Interest of such Holder is impaired under the Plan, (b) such Holder or entity has voted to accept

or reject the Plan, and (c) such Holder or entity has filed or is deemed to have filed a proof of Claim or Equity Interest, made a demand for payment of any Claim, or has made an appearance in any of the Chapter 11 Cases. Upon confirmation and the occurrence of the Effective Date, the Plan shall be binding upon the members of all Classes, including but not limited to the Deemed Rejecting Classes.

S.     All modifications to the Plan or to documents incorporated as part of the Plan, including the Contract Assumption Schedule, announced prior to the conclusion of the Confirmation Hearing constitute technical changes and/or changes that have either been consented to by the affected constituents or which do not adversely affect or change the treatment of any other Claims or Equity Interests. Accordingly, pursuant to Bankruptcy Rule 3019, these modifications do not require additional disclosure under Bankruptcy Code sections 1125 or 1127(a), or resolicitation of votes under Bankruptcy Code section 1126, nor do they require that Holders of Claims or Equity Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan. The Plan as so modified meets the requirements of Bankruptcy Code sections 1122 and 1123. Such modifications shall be deemed accepted by each Holder of a Claim or Equity Interest who has previously voted to accept the Plan.

T.     Each term and provision of the Plan is valid and enforceable pursuant to its terms.

U.     Pursuant to section 1146 of the Bankruptcy Code, (a) the issuance, transfer of exchange of any securities, instruments, or documents, (b) the creation of any Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease or sublease or

the making of delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with this Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under this Plan or the revesting , transfer or sale of any real or personal property of the Debtors pursuant to, in implementation of, or as contemplated in the Plan and (d) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded is ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

V.     Entry of the Confirmation Order shall constitute approval by this Court of the Reorganized Debtors' or Acquirer's assumption of the Assumed Obligations listed in the Contract Assumption Schedule, as of the Effective Date pursuant to section 365(a) of the Bankruptcy Code, subject to Court reconsideration upon approval of a Sale under the Alternative B -- Auction Process and Sale, provided for in Article VI, Sections 6.15 and 6.16 of the Plan. As provided in Article V of the Plan (and except as otherwise expressly provided herein or in the Confirmation Order with respect to a particular identified contract or lease), with respect to any

contract, lease or other agreement listed on the Contract Assumption Schedule, no monetary or non-monetary defaults by the Debtors currently exist under or with respect to such contracts (including, without limitation, any claims for fraud or misrepresentation that may be asserted by the non-Debtor to such contracts) or, alternatively, the assumption of such contracts shall satisfy or eliminate any damage claims that the non-Debtor parties thereto may be able to assert as to such existing defaults, without the necessity of paying any cure amounts to such non-Debtor parties on the Effective Date.

W.      Unless otherwise provided by law, the reversal or modification of the Confirmation Order and these Findings on appeal shall not affect the validity of the Plan, or any agreement or action authorized by the Confirmation Order or under the Plan with respect to any entity acting in good faith, whether or not that entity knows of the appeal, unless the Confirmation Order is stayed pending appeal.

X.      Based on the foregoing Findings of Fact and Conclusions of Law, the Plan Proponents are entitled to the entry of the Confirmation Order.

--------------------------------------------END OF DOCUMENT--------------------------------------------

Approved as to Form and Content:

_Eric H. Karasik_ on behalf of Utah 7000, LLC, et al, Debtors and Debtors in Possession

_[signature]_, Dorsey & Whitney LLP on behalf of Credit Suisse, Cayman Islands Branch, as First Lien Agent

_Kenneth Cox_, Durham Jones & Pinegar, on behalf of Wells Fargo Bank, NA, as agent for Second Lien Lenders

_[signature]_, J. Thomas Beckett, Parsons Behle & Latimer, for the Committee.

_Brian D. Bolinder_, Brian D. Bolinder, Snitker Axland, PLLC, for Ames Construction, Inc.

_[signature]_ Michael D. Warner, Warner Stevens, LLP, counsel for Highland Crystal Management, LP, As manager for various Institutional Funds.

Attached as per order
entered 3-12-09
JHB

Exhibit A

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

|  |  |
|---|---|
| In re: | Case No. 08-21869 |
| UTAH 7000, L.L.C., et al., | Jointly Administered with Case Nos. 08-21870, 08-21872, 08-22075, 08-22077, and 08-27712 |
| Debtors. | |
| Address:  8758 N. Promontory Ranch Road<br>Park City, UT  84098 | Chapter 11 |
| Tax Id. Nos.:  47-0920837, 86-0986819, 75-3148710, 86-0991146, 86-1023965, and 47-0920840 | |

## FOURTH AMENDED JOINT PLAN OF REORGANIZATION PROPOSED BY THE DEBTORS AND FIRST LIEN AGENT (DATED FEBRUARY 9, 2009)

**SIDLEY AUSTIN LLP**
Richard W. Havel (Cal. Bar No. 52922)
Elizabeth W. Walker (Cal. Bar No. 113545)
555 West Fifth Street, Suite 4000
Los Angeles, California  90013-1010
Telephone:  (213) 896-6000
Facsimile:  (213) 896-6600

**DORSEY & WHITNEY LLP**
Annette W. Jarvis (1649)
Scott A. Cummings (11443)
136 South Main Street, Suite 1000
Salt Lake City, Utah 84101-1685
Telephone:  (801) 933-8933
Facsimile:  (801) 933-7373

Counsel for Credit Suisse, Cayman Islands Branch, as First Lien Agent

**STUTMAN, TREISTER & GLATT PC**
Ralph R. Mabey (Utah Bar No. 2036)
K. John Shaffer (Cal. Bar No. 153729)
Eve H. Karasik (Cal Bar No. 155356)
1901 Avenue of the Stars, 12th Floor
Los Angeles, California  90067
Telephone:  (310) 228-5600
Facsimile:  (310) 228-5788

**STOEL RIVES LLP**
Danny C. Kelly (1788)
201 S. Main Street, #1100
Salt Lake City, Utah 84111
Telephone:  (801) 578-6979
Facsimile:  (801) 578-6999

Reorganization Counsel for the Debtors and Debtors in Possession

NOTICE: NO DISCLOSURE STATEMENT HAS
BEEN APPROVED FOR THIS PLAN.
NO ACCEPTANCES OR REJECTIONS OF THIS
PLAN MAY BE SOLICITED AT THIS TIME

## <u>TABLE OF CONTENTS</u>

ARTICLE I      DEFINITIONS AND GENERAL PROVISIONS.................................................1

    A.    Definitions.................................................................................................1

    B.    Interpretation..........................................................................................16

    C.    Computation of Time..............................................................................16

ARTICLE II     CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
               INTERESTS ............................................................................................18

ARTICLE III TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS......................19

    3.1.    Class 1 -- Priority Non-Tax Claims. ......................................................19

        (A)    Classification....................................................................................19

        (B)    Allowance .........................................................................................19

        (C)    Treatment .........................................................................................19

        (D)    Impairment and Voting ....................................................................19

    3.2.    Class 2 -- Other Secured Claims............................................................19

        (A)    Classification....................................................................................19

        (B)    Allowance .........................................................................................19

        (C)    Treatment .........................................................................................19

        (D)    Impairment and Voting ....................................................................20

    3.3.    Class 3 -- First Lien Lender Claims. ......................................................20

        (A)    Classification....................................................................................20

        (B)    Allowance .........................................................................................20

        (C-1)    Treatment .........................................................................................20

        (C-2)    Alternative B Treatment ..................................................................19

        (D)    Impairment and Voting ....................................................................20

    3.4.    Class 4 -- Second Lien Lender Claims. ..................................................21

        (A)    Classification....................................................................................21

        (B)    Allowance .........................................................................................21

        (C-1)    Treatment .........................................................................................21

        (C-2)    Alternative B Treatment ..................................................................20

        (D)    Impairment and Voting ....................................................................22

    3.5.    Class 5 -- General Unsecured Claims. ...................................................22

        (A)    Classification....................................................................................22

i

NOTICE: NO DISCLOSURE STATEMENT HAS
BEEN APPROVED FOR THIS PLAN.
NO ACCEPTANCES OR REJECTIONS OF THIS
PLAN MAY BE SOLICITED AT THIS TIME

      (B)    Allowance ................................................................................22

      (C)    Treatment ...............................................................................23

      (D)    Impairment and Voting ...........................................................23

   3.6.    Class 6 -- Convenience Claims. .....................................................23

      (A)    Classification...........................................................................23

      (B)    Allowance ...............................................................................23

      (C)    Treatment ...............................................................................23

      (D)    Convenience Claim Election....................................................21

      (E)    Impairment and Voting ...........................................................23

   3.7.    Class 7 -- Intercompany Claims......................................................24

      (A)    Classification...........................................................................24

      (B)    Allowance ...............................................................................24

      (C)    Treatment ...............................................................................24

      (D)    Impairment and Voting ...........................................................24

   3.8.    Class 8 -- Equity Interests. .............................................................24

      (A)    Classification...........................................................................24

      (B)    Allowance ...............................................................................24

      (C)    Treatment ...............................................................................24

      (D)    Impairment and Voting ...........................................................24

ARTICLE IV  TREATMENT OF UNCLASSIFIED CLAIMS........................................22

   4.1.    Summary .........................................................................................24

   4.2.    DIP Loan Claims.............................................................................25

   4.3.    Administrative Expense Claims......................................................25

   4.4.    Priority Tax Claims.........................................................................25

   4.5.    Professional Compensation Claims ................................................25

ARTICLE V  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
      LEASES .................................................................................................26

   5.1.    Assumption or Rejection of Executory Contracts and Unexpired Leases.........................26

      (A)    Rejected Contracts and Leases................................................24

      (B)    Assumed Obligations...............................................................24

      (C)    Club Member and Lot and Home Purchase Agreements........................24

      (D)    Right to Reject Assumed Obligations.....................................24

NOTICE: NO DISCLOSURE STATEMENT HAS
BEEN APPROVED FOR THIS PLAN.
NO ACCEPTANCES OR REJECTIONS OF THIS
PLAN MAY BE SOLICITED AT THIS TIME

LA1 1449243v.3

| | | |
|---|---|---|
| 5.2. | Payment of Cure Amounts | 27 |
| 5.3. | Objections to Assumption and Proposed Cure Amounts | 27 |
| | (A) Requirement of Timely Objection | 27 |
| | (B) Consequences of Failure To Object | 27 |
| 5.4. | Rejection Claims Bar Date | 26 |
| 5.5. | Post-Petition Contracts and Leases | 28 |
| ARTICLE VI | MEANS FOR IMPLEMENTATION OF THE PLAN | 29 |
| 6.1. | Continued Corporate Existence | 29 |
| 6.2. | Amended LLC Agreements | 29 |
| 6.3. | Formation of NewCo | 29 |
| 6.4. | Exit Financing | 29 |
| 6.5. | Directors and Officers of NewCo. | 29 |
| | (A) Board of Directors of NewCo | 29 |
| | (B) Ownership and Management of the Reorganized Debtors | 30 |
| | (C) Officers of NewCo | 30 |
| 6.6. | Employee Matters | 30 |
| 6.7. | Issuance of New Secured Notes | 31 |
| 6.8. | Issuance of New Common Stock and Other Equity Interests. | 31 |
| | (A) New Common Stock | 31 |
| | (B) New Warrants | 28 |
| | (C) New Stockholders Agreement | 31 |
| | (D) New Membership Interests | 31 |
| 6.9. | Cancellation of Equity Interests and Other Instruments | 31 |
| 6.10. | Corporate Action | 32 |
| 6.11. | Dissolution of the Committee | 32 |
| 6.12. | Pre-Effective Date Injunctions or Stays | 29 |
| 6.13. | Preservation of Retained Actions | 32 |
| 6.14. | Exemption From Certain Transfer Taxes | 32 |
| 6.15 | Alternative B | 30 |
| 6.16 | Alternative B - An Auction Process and Sale | 30 |
| | 6.16.2 The Marketing Process | 31 |
| | 6.16.3 The Sale Procedures Motion | 31 |

iii

NOTICE: NO DISCLOSURE STATEMENT HAS
BEEN APPROVED FOR THIS PLAN.
NO ACCEPTANCES OR REJECTIONS OF THIS
PLAN MAY BE SOLICITED AT THIS TIME

LA1 1449243v.3

The Closing of the Sale.................................................................................................33

ARTICLE VII DISTRIBUTIONS AND CLAIMS RECONCILIATION..............................................36

7.1.    Payment of Claims Allowed as of the Effective Date ........................................36

7.2.    Time of Distributions.........................................................................................36

7.3.    No Interest on Allowed Claims..........................................................................36

7.4.    Claims Administration Responsibility...............................................................34

    (A)    Sole Responsibility of the Reorganized Debtors and Committee...........37

    (B)    Objections to Claims.............................................................................37

    (C)    Determination and Estimation of Allowed Claims................................37

7.5.    Delivery of Distributions ..................................................................................37

7.6.    Bar Date For Certain Administrative Claims......................................................35

7.7.    Procedures for Treating and Resolving Disputed and Contingent Claims. .......38

    (A)    No Distributions Pending Allowance ...................................................38

    (B)    Disputed Claim Reserve Account..........................................................39

    (C)    Claim Estimation Procedure .................................................................36

    (D)    Distributions After Allowance ..............................................................39

    (E)    Limitation on Distribution ....................................................................37

    (F)    No Recourse...........................................................................................40

7.8.    Compromises and Settlements...........................................................................40

7.9.    Disbursing Agent ...............................................................................................40

7.10.    De Minimis or Fractional Distributions............................................................37

7.11.    Setoffs and Recoupment ...................................................................................41

7.12.    Compliance with Tax Requirements..................................................................41

ARTICLE VIII EFFECT OF THIS PLAN ON CLAIMS AND INTERESTS .......................................41

8.1.    Revesting of Assets............................................................................................41

8.2.    [Intentionally Omitted] .....................................................................................38

8.3.    Treatment of Retained Actions and Avoidance Actions....................................38

    (A)    Retained Actions...................................................................................42

    (B)    Avoidance Actions................................................................................39

    (C)    Distribution of Proceeds from Certain Retained Actions ......................39

8.4.    Discharge of Claims and Termination of Equity Interests.................................43

    (A)    Discharge. .............................................................................................43

iv

NOTICE: NO DISCLOSURE STATEMENT HAS
BEEN APPROVED FOR THIS PLAN.
NO ACCEPTANCES OR REJECTIONS OF THIS
PLAN MAY BE SOLICITED AT THIS TIME

(B)   Prohibition on Assertion of Discharged Claims and
             Equity Interests. ...........................................................................43

8.5.   Release of Certain Parties by the Reorganized Debtors ....................................44

8.6   Release of Certain Parties by the Holders of Claims and Equity Interests.......................41

8.7.   Equity Settlement Payment...............................................................................42

       8.7.1   Remedies Upon Failure to Pay Equity Settlement Amount.....................43

8.8.   Exculpation and Limitation of Liability ...........................................................48

8.9.   [Intentioanlly Omitted] ...................................................................................48

8.10.   Effect of Confirmation.....................................................................................49

       (A)   Binding Effect..........................................................................................49

       (B)   Filing of Reports ....................................................................................49

ARTICLE IX   CONDITIONS PRECEDENT .......................................................................49

9.1.   Conditions to Confirmation ............................................................................49

9.2.   Conditions to Occurrence of the Effective Date..............................................44

9.3.   Waiver of Conditions to Effective Date...........................................................50

ARTICLE X   RETENTION AND SCOPE OF JURISDICTION OF THE
            BANKRUPTCY COURT .......................................................................50

10.1.   Retention of Jurisdiction ...............................................................................50

10.2.   Alternative Jurisdiction .................................................................................52

ARTICLE XI   MISCELLANEOUS PROVISIONS.................................................................52

11.1.   Modification of the Plan ...............................................................................52

11.2.   Terms Binding ..............................................................................................52

11.3.   Successors and Assigns.................................................................................52

11.4.   Confirmation Order and Plan Control............................................................52

11.5.   Governing Law ............................................................................................52

11.6.   Severability ..................................................................................................53

11.7.   Incorporation by Reference...........................................................................53

11.8.   Payment of Statutory Fees ...........................................................................53

11.9.   Notice...........................................................................................................53

11.10.   Reservation of Rights....................................................................................54

NOTICE: NO DISCLOSURE STATEMENT HAS
BEEN APPROVED FOR THIS PLAN.
NO ACCEPTANCES OR REJECTIONS OF THIS
PLAN MAY BE SOLICITED AT THIS TIME

Utah 7000, L.L.C. ("Utah 7000"), Utah 7000 Development, L.L.C. ("Development"), Utah 7000 Capital, L.L.C. ("Capital"), Utah 7000 Realty, L.L.C. ("Realty"), Utah 7000 Cabins, L.L.C. ("Cabins") and Pivotal Promontory TRC, L.L.C. ("TRC"), each a debtor and debtor-in-possession in the above-captioned bankruptcy cases (collectively, the "Debtors"), and Credit Suisse, Cayman Islands Branch ("Credit Suisse"), in its capacity as First Lien Agent (as hereinafter defined), hereby submit the following Joint Plan of Reorganization Proposed by Debtors and the First Lien Agent (the "Plan") for the resolution of the outstanding claims against and interests in the Debtors. Reference is made to the Disclosure Statement (as hereinafter defined), distributed contemporaneously herewith, for a discussion of the Debtors' history, properties and business operations, projections for those operations, risk factors, summary and analysis of this Plan, and certain related matters, including, among other things, the securities to be issued under this Plan. Subject to certain restrictions and requirements set forth in 11 U.S.C. § 1127, Fed. R. Bankr. P. 3019, and Section 11.1 of this Plan, the Debtors and the First Lien Agent reserve the right to alter, amend, modify or withdraw this Plan at any time prior to its substantial consummation.

## ARTICLE I

## DEFINITIONS AND GENERAL PROVISIONS

A.    **Definitions.** The following terms (which appear in this Plan as capitalized terms) shall have the meanings set forth below. Any capitalized term used in this Plan that is not defined herein, but is defined in either the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules.

"Acquirer" has the meaning ascribed to it in Section 6.16 of this Plan.

"Administrative Expense Claim" means a Claim for payment of an administrative expense of the kind described in section 503(b) of the Bankruptcy Code and entitled to priority under section 507(a)(2) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses, incurred on or after the Petition Date, of preserving the Estates or operating the businesses of the Debtors, (b) any actual indebtedness or obligations incurred or assumed by the Debtors during the pendency of the Chapter 11 Cases in the ordinary course of business, (c) any actual expenses necessary or appropriate to facilitate or effectuate this Plan, (d) any amount required to be paid under section 365(b)(1) of the Bankruptcy Code in connection with the assumption of executory contracts or unexpired leases pursuant to the Plan, (e) all Professional Compensation Claims to the extent allowed by the Bankruptcy Court under sections 328, 330 or 503 of the Bankruptcy Code, and (f) all fees and charges payable by the Debtors pursuant to Section 1930 of title 28 of the United States Code.

"Agent Notice" means a notice that the First Lien Agent shall provide to the Court and the Debtors no later than five (5) Business Days after the Confirmation Date if the First Lien Agent will not be able to obtain the Exit Financing necessary for implementation of the Plan by the Effective Date. If the First Lien Agent does not deliver the Agent Notice, then it will be

1

NOTICE: NO DISCLOSURE STATEMENT HAS
BEEN APPROVED FOR THIS PLAN.
NO ACCEPTANCES OR REJECTIONS OF THIS
PLAN MAY BE SOLICITED AT THIS TIME

deemed to have certified to the Court, the Committee and the Debtors that it will be able to obtain the Exit Financing and have an Effective Date, subject to the satisfaction or waiver of the conditions set forth in Article IX, that is no later than the Exit Financing Deadline. If the Effective Date does not occur on or before the Exit Financing Deadline, then the First Lien Agent shall be deemed to have given the Agent Notice as of the Exit Financing Deadline.

"Allowed Claim" means a Claim that is not a Disputed Claim and is either (a) a Claim against any of the Debtors with respect to which a proof of claim was or will be timely filed with the Bankruptcy Court and has not been withdrawn or superseded, or by order of the Bankruptcy Court is not or will not be required to be filed, (b) a Claim that has been listed in the Schedules as neither disputed, contingent or unliquidated, and for which no proof of claim has been timely filed, or (c) a Claim allowed pursuant to this Plan or an order of the Bankruptcy Court, which order has not been stayed or reversed on appeal; provided, however, that with respect to any Claim described in clauses (a) or (b) above, such Claim shall be allowed only if (i) no objection to allowance thereof has been interposed within the applicable period of time fixed by the Plan or the Bankruptcy Court, or (ii) such an objection is so interposed and the Claim is nevertheless allowed by an order of the Bankruptcy Court (but only if such allowance was not solely for the purpose of voting to accept or reject the Plan). Unless otherwise specified in this Plan or in an order of the Bankruptcy Court allowing such Claim, an Allowed Claim shall not include (x) any interest on the amount of such Claim accruing from and after the Petition Date, (y) any punitive or exemplary damages, or (z) any fine, penalty or forfeiture.

"Alternative B" has the meaning set forth in Sections 6.15 and 6.16 of the Plan.

"Allowed Claim" means a Claim of the particular type specified that is also an Allowed Claim (e.g., an Allowed Administrative Expense Claim is an Administrative Expense Claim that is also an Allowed Claim).

"Amended LLC Agreements" has the meaning assigned to such term in Section 6.2 of this Plan.

"Assets" means all property of the Estates within the meaning of section 541 of the Bankruptcy Code, of any nature whatsoever, including, without limitation, all property, real and personal, tangible and intangible, wherever situated, as such property exists on the Effective Date or thereafter, but excluding all Causes of Action released, waived or extinguished by the Debtors pursuant to this Plan or a Final Order of the Bankruptcy Court.

"Assumed Obligations" means, collectively, (a) all payment and performance obligations of the Debtors under executory contracts, leases, and other obligations assumed by the Reorganized Debtors or Acquirer pursuant to this Plan, including all obligations of the Debtors to members of the Club as set forth in the membership plan and the individual membership agreements (including all obligations to honor membership deposits and club credits); (b) the Debtors' obligations to purchasers under lot and home purchase agreements for real properties within the Project, including warranty obligations related thereto; and (c) the

2

NOTICE: NO DISCLOSURE STATEMENT HAS
BEEN APPROVED FOR THIS PLAN.
NO ACCEPTANCES OR REJECTIONS OF THIS
PLAN MAY BE SOLICITED AT THIS TIME

Debtors' governmental and entitlement rights and obligations vis-à-vis Summit County, Utah and other local governmental entities, all as identified by the Plan Proponents on the Contract Assumption Schedule and to the extent the foregoing are assumed by the Reorganized Debtors or the Acquirer in accordance with Section 5.1 of this Plan.

"Avoidance Actions" means any Causes of Action of the Estates arising under sections 542, 543, 544, 545, 546, 547, 548, 549, 550 or 553 of the Bankruptcy Code, regardless of whether or not such Cause of Action was commenced prior to the Effective Date.

"Ballot" means each of the ballot forms for voting to accept or reject this Plan distributed to all Holders who are entitled to vote on the Plan.

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as amended from time to time, and also includes §§ 157, 158, 1334, 1408, 1412 and 1452 of title 28 of the United States Code to the extent applicable to the Chapter 11 Cases.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Utah, Central Division, in which the Chapter 11 Cases were filed, or any other court that exercises jurisdiction over the Chapter 11 Cases.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure promulgated under 28 U.S.C. § 2075, and any applicable Local Rules and standing orders of the Bankruptcy Court, as amended from time to time.

"Brown Stembridge Note Claims" means all Other Secured Claims against Development arising under that certain Promissory Note and related Deed of Trust dated August 25, 2005, issued by Development in favor of The Elden F. Stembridge and Juanita Lee Brown Stembridge Family Trust, in the original principal amount of $878,549.34, and secured by first priority liens on certain real property owned by Development.

"Business Day" means any day other than a Saturday, Sunday or a "legal holiday," as such term is defined in Bankruptcy Rule 9006(a).

"Cabins" means Utah 7000 Cabins, L.L.C. (f/k/a Pivotal Promontory Cabins, L.L.C.), an Arizona limited liability company and one of the Debtors.

"Capital" means Utah 7000 Capital, L.L.C. (f/k/a Pivotal Promontory Capital, L.L.C.), an Arizona limited liability company and one of the Debtors.

"Causes of Action" means any and all Claims and causes of action held by or capable of assertion by the Debtors, their Estates and/or the Committee, including, without limitation, all Avoidance Actions, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed,

NOTICE: NO DISCLOSURE STATEMENT HAS
BEEN APPROVED FOR THIS PLAN.
NO ACCEPTANCES OR REJECTIONS OF THIS
PLAN MAY BE SOLICITED AT THIS TIME

LAI 1449243v.3

contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or assertable, directly or derivatively, in law, equity or otherwise.

"Chapter 11 Cases" means, collectively, the reorganization proceedings of the Debtors under chapter 11 of the Bankruptcy Code, Case Nos. 08-21869, 08-21870, 08-21872, 08-22075, 08-22077, and 08-27712, filed with the Bankruptcy Court on the applicable Petition Date and jointly administered under Case No. 08-21869.

"Claim" means a "claim" as defined in section 101(5) of the Bankruptcy Code.

"Claim Estimation Procedure" has the meaning ascribed to it in Section 7.7 of this Plan.

"Claims Bar Date" means, as applicable, either (i) September 8, 2008, the final date for all Persons asserting certain Claims against any of the Debtors (other than TRC) to file proofs of claim on account of such Claims, and with respect to Claims against TRC, December 3, 2008, (ii) thirty (30) days after notice of an amendment to the Schedules with respect to a Claim that previously was scheduled in a liquidated, non-contingent, and undisputed amount, which amendment either (a) reduces the amount or lowers the priority status of such Claim, or (b) changes the status of such Claim to unliquidated, contingent, or disputed, (iii) such other date as the Bankruptcy Court may fix as the final date for filing proofs of claim on account of Rejection Claims pursuant to Section 5.4 of this Plan, or (iv) such other date as the Bankruptcy Court may fix as the final date for filing proofs of claim on account of Administrative Expense Claims pursuant to Section 7.6 of this Plan.

"Claims Objection Deadline" means the later of (a) ninety (90) days after the Effective Date or (b) thirty (30) days after the filing of any Claim, including any Rejection Claim; provided, however, that the deadline may be extended before its expiration by an Order of the Bankruptcy Court, which may be obtained upon a showing of cause pursuant to an ex parte application by, as applicable, the Reorganized Debtors or the Committee, and provided, further, the Claims Objection Deadline shall not apply to any Claim filed after the applicable Claims Bar Date, which shall automatically be treated as a Disputed Claim under this Plan.

"Class" means a category or group of substantially similar Claims or Equity Interests as designated in Articles II and III of this Plan.

"Club" means Promontory Ranch Club.

"Collateral" means any property or interest in property of the Estates subject to a Lien to secure the payment or performance of a Claim, which Lien is neither avoided nor otherwise deemed invalid pursuant to an Order of the Bankruptcy Court.

"Committee" means the Official Committee of Unsecured Creditors appointed in Development's Chapter 11 Case by the Office of the United States Trustee.

4

NOTICE: NO DISCLOSURE STATEMENT HAS
BEEN APPROVED FOR THIS PLAN.
NO ACCEPTANCES OR REJECTIONS OF THIS
PLAN MAY BE SOLICITED AT THIS TIME

"Committee Expense Reserve" means the fund in the amount of $75,000 to be established on the Effective Date, to fund all professionals' fees and other expenses of the Committee incurred after the Effective Date. The Committee Expense Reserve shall be funded on the Effective Date and shall be held in trust by the Reorganized Debtors for the benefit of the Committee.

"Confirmation" means the Bankruptcy Court's entry of the Confirmation Order with respect to the Chapter 11 Cases.

"Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order with respect to the Chapter 11 Cases.

"Confirmation Hearing" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

"Confirmation Order" means an order and related findings of fact and conclusions of law of the Bankruptcy Court approving and confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

"Contract Assumption Schedule" means the schedule of executory contracts, unexpired leases, and other Assumed Obligations to be assumed pursuant to sections 365(a) and 1123 of the Bankruptcy Code, which the First Lien Agent shall file with the Bankruptcy Court no later than five (5) Business Days prior to the last day for parties to object to confirmation of the Plan and to vote to accept or reject the Plan, and, to the extent that each executory contract or unexpired lease listed in the Contract Assumption Schedule relates to the use or occupancy or real property, (i) any modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in the Contract Assumption Schedule, and (ii) any executory contracts or unexpired leases appurtenant to the premises listed in the Contract Assumption Schedule, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, and any other interests in real estate or rights in rem relating to such premises to the extent any of the foregoing are executory contracts or unexpired leases, unless any of the foregoing agreements are expressly rejected by the Debtors prior to the Effective Date.

"Convenience Claim" means (a) any Unsecured Claim in an amount equal to or less than $1,000 or (b) any Unsecured Claim in an amount greater than $1,000 whose Holder has agreed to voluntarily reduce such Unsecured Claim to $1,000 in accordance with the Convenience Claim Election. Such Convenience Claims shall be paid from an account maintained and administered by the Reorganized Debtors.

5

NOTICE: NO DISCLOSURE STATEMENT HAS
BEEN APPROVED FOR THIS PLAN.
NO ACCEPTANCES OR REJECTIONS OF THIS
PLAN MAY BE SOLICITED AT THIS TIME

LA1 1449243v.3

"Convenience Claim Election" means the election available to Holders of Unsecured Claims in an amount greater than $1,000 pursuant to Section 3.6 of this Plan.

"Credit Suisse" means Credit Suisse, Cayman Islands Branch.

"Cure Amount" means an amount sufficient to satisfy the Debtors' obligations under section 365(b) of the Bankruptcy Code with respect to the assumption of an executory contract or unexpired lease in accordance with the provisions of Article V of this Plan, as either (a) set forth on the Contract Assumption Schedule to be filed with the Bankruptcy Court and served on all parties to such executory contracts and unexpired leases and the Committee no later than five (5) Business Days prior to the last day for parties to object to confirmation of the Plan and to vote to accept or reject the Plan, or (b) if a non-debtor party to such an executory contract or unexpired lease objects to the amount set forth on the Contract Assumption Schedule, an amount agreed to by First Lien Agent (or, following the closing of a Sale, the Acquirer) and such non-debtor party or, absent such agreement, an amount to be determined by the Bankruptcy Court.

"Current Equity Owners" means Pivotal Group X L.L.C. and Arizona PSPRS Trust, as successor to the Public Safety Personnel Retirement System of the State of Arizona, as the Holders of Equity Interests in each of Utah 7000, Capital and Development.

"Current Equity Owners Parties" has the meaning ascribed to it in Section 8.6 of this Plan.

"Debtors" means, as applicable, one or more of Utah 7000, Capital, Development, Cabins, Realty and TRC, including in their capacities as debtors-in-possession in the Chapter 11 Cases under sections 1101, 1107(a) and 1108 of the Bankruptcy Code.

"Development" means Utah 7000 Development, L.L.C. (f/k/a Pivotal Promontory Development, L.L.C.), an Arizona limited liability company and one of the Debtors.

"DIP Loan Claims" means the Claims of Pivotal Finance, LLC arising under the debtor-in-possession financing facility Pivotal Finance, LLC provided to the Debtors pursuant to the *Order Granting Motion Under 11 U.S.C. §§ 105, 361, 362, 363(c) & (e), 364(c)(1) & (2), 364(d), and 364(e), Fed. R. Bankr. P. 2002, 4001, and 9014, and Local Rule 4001-2 Authorizing Debtors to Obtain Postpetition Financing on Superpriority, Secured, and Priming Basis (Pivotal Finance, LLC)*, entered by the Bankruptcy Court on July 22, 2008, the "Order Granting Motion Authorizing Debtors To Extend And Amend Postpetition Financing On Superpriority, Secured, And Priming Basis" entered by the Bankruptcy Court on January 30, 2009, and any extensions, amendments, additions or other modifications thereto.

"Disbursing Agent" means one or more disbursing agents selected pursuant to Section 7.9 of this Plan for the purpose of receiving and making Distributions to Holders of Allowed Claims as provided in Article VII of this Plan, without the necessity of posting a bond.

6

NOTICE: NO DISCLOSURE STATEMENT HAS
BEEN APPROVED FOR THIS PLAN.
NO ACCEPTANCES OR REJECTIONS OF THIS
PLAN MAY BE SOLICITED AT THIS TIME

"Disclosure Statement" means the disclosure statement that accompanies this Plan, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Court, and all supplements, schedules and exhibits thereto.

"Disputed Claim" means any Claim against a Debtor to the extent that (a) the allowance of such Claim or any portion thereof is the subject of an objection, appeal or motion to disallow or estimate that has been timely filed by a party in interest and which objection, appeal or motion has not been determined by an order of the Bankruptcy Court, (b) such Claim is listed in the Schedules as either disputed, contingent and/or unliquidated, (c) during the period prior to the Claims Objection Deadline, such Claim is in excess of the amount scheduled by the Debtors in the Schedules as other than disputed, contingent and/or unliquidated, or (d) such Claim is filed after the applicable Claims Bar Date.

"Disputed Claim Reserve Account" means a segregated, interest bearing account maintained and administered by the Reorganized Debtors for the purpose of holding cash for Distribution on account of Disputed Claims pursuant to Section 7.7 of this Plan.

"Distribution" means any distribution by the Debtors or the Reorganized Debtors to the Holders of Allowed Claims pursuant to Article VII of this Plan.

"Distribution Date" means (a) the Initial Distribution Date, (b) the first Business Day after the end of the months of June and December, commencing with the first such date to occur more than ninety (90) days after the Initial Distribution Date and until the Final Distribution Date, or (c) the Final Distribution Date; provided, however, that (i) a Distribution Date (other than the Initial Distribution Date and Final Distribution Date) shall not occur if the aggregate value of the scheduled Distributions on account of all Allowed Claims on any Distribution Date is less than $50,000, in which case the amount to be distributed shall be retained and added to the amount to be distributed on the next Distribution Date, and (ii) any General Unsecured Claim that becomes an Allowed Claim less than twenty (20) Business Days prior to a Distribution Date shall be treated as a Disputed Claim for purposes of the Distribution occurring on such Distribution Date, and the Holder of such General Unsecured Claim shall not receive a Distribution until the Distribution Date immediately succeeding such Distribution Date.

"Effective Date" means the date specified by the Plan Proponents in a notice filed with the Bankruptcy Court as the date on which the Plan shall take effect, which date shall not be more than eleven (11) calendar days after the Confirmation Date, provided if such date falls on a weekend or holiday, then the first Business Day thereafter. If the auction process under the Alternative B set forth in Section 6.16 applies then the closing of the Sale in accordance with the Sale Procedures shall constitute the Effective Date. The deadline for the Effective Date may be extended by the written consent of all the Plan Proponents before the expiration thereof. Extensions beyond April 30, 2009, shall require written consent of all the Plan Proponents and an order from the Bankruptcy Court extending the Effective Date.

7

NOTICE: NO DISCLOSURE STATEMENT HAS
BEEN APPROVED FOR THIS PLAN.
NO ACCEPTANCES OR REJECTIONS OF THIS
PLAN MAY BE SOLICITED AT THIS TIME

"Equity Interest" means the interest of any Holder of equity securities or other ownership interests of a Debtor represented by any issued and outstanding shares of common, preferred or convertible preferred stock, membership interests or other equity instrument evidencing a present ownership interest in such Debtor, whether or not transferable, or any options, warrants, or rights, contractual or otherwise, obligating the Debtor to issue, transfer, purchase, redeem, or sell any equity securities or other ownership rights, any rights under any stock option plans, voting agreements and registration rights agreements regarding equity securities or other ownership interests of such Debtor, any claims arising from the rescission of a purchase, sale or other acquisition of any equity security or other ownership interests (or any right, claim, or interest in and to any common stock or equity security) of such Debtor, any claims for the payment of dividends on any shares of common, preferred or convertible preferred stock or membership interests of such Debtor, and any claims for damages or any other relief arising from the purchase, sale, or other acquisition of any equity securities or other ownership interests issued by the Debtor.

"Equity Settlement Payment" means (i) a cash payment in the amount of $7,275,000 and (ii) the waiver by Pivotal Group X L.L.C. and its affiliates of $407,989 in General Unsecured Claims against the Debtors that arose prior to the Petition Date, which cash payment the Current Equity Owners shall make no later than five (5) Business Days after the Confirmation Date pursuant to Section 8.7 of this Plan to a trust account held by counsel for the Debtors, for turnover to the Reorganized Debtors on the Effective Date, in consideration for the compromises in this Plan and release on the Effective Date by the Debtors of the Current Equity Owners and their respective directors, officers, managers, members, owners, employees, attorneys and agents from all potential Avoidance Actions and other Causes of Action that the Debtors or their Estates could pursue against the Current Equity Owners and their respective directors, officers, managers, members, owners, employees, attorneys and agents.

"Estates" means the estates of the Debtors, individually or collectively, as is appropriate in the context, created by the commencement of the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code and consisting of all Assets of the Debtors.

"Estimation Claim" has the meaning ascribed to it in Section 7.7 of this Plan.

"Estimation Hearing" has the meaning ascribed to it in Section 7.7 of this Plan.

"Exculpated Parties" has the meaning ascribed to it in Section 8.8 of this Plan.

"Exit Financing" means, subject to further analysis and market considerations, an anticipated senior secured term loan facility in the principal amount of [$85 million], maturing on the fourth anniversary of the Effective Date, bearing interest at a market clearing rate and other such terms as are acceptable to the First Lien Agent. NewCo and each Reorganized Debtor shall be party to the Exit Financing as a borrower. The Exit Financing shall be secured by Liens on substantially all assets of NewCo and each Reorganized Debtor that shall be junior only to the Liens securing any Other Secured Claims that shall be reinstated and left unimpaired on the

8

NOTICE: NO DISCLOSURE STATEMENT HAS
BEEN APPROVED FOR THIS PLAN.
NO ACCEPTANCES OR REJECTIONS OF THIS
PLAN MAY BE SOLICITED AT THIS TIME

Effective Date.  The Plan Supplement shall include the material terms of the Exit Financing as of the date of the Plan Supplement.

"Exit Financing Deadline" means the later of March 9, 2009 or the eleventh (11th) calendar day after the Confirmation Date, provided that such date may be extended from time to time upon the written consent of all the Plan Proponents.

"Final Distribution" means the Distribution by the Reorganized Debtors that satisfies all remaining Allowed Claims in accordance with the Plan.

"Final Distribution Date" means the Distribution Date, which shall be after the date on which all remaining Disputed Claims have been resolved by Final Order, on which the Final Distribution is made by the Reorganized Debtors.

"Final Order" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the subject matter (a) that has not been reversed, stayed, modified or amended and as to which (i) any right to appeal or seek certiorari, review, reargument, stay or rehearing has been waived or (ii) the time to appeal or seek certiorari, review, reargument, stay or rehearing has expired and no appeal or petition for certiorari, review, reargument, stay or rehearing is pending or (b) as to which an appeal has been taken or petition for certiorari, review, reargument, stay or rehearing has been filed and (i) such appeal or petition for certiorari, review, reargument, stay or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, review, reargument, stay or rehearing was sought or (ii) the time to further appeal or seek certiorari, further review, reargument, stay or rehearing has expired and no such further appeal or petition for certiorari, further review, reargument, stay or rehearing is pending.

"First Lien Agent" means Credit Suisse in its capacities as administrative agent and collateral agent under the First Lien Credit Agreement, and its successors and assigns.

"First Lien Credit Agreement" means that certain Credit Agreement dated as of August 31, 2005 (as amended, restated, supplemented or otherwise modified from time to time), by and among Utah 7000, Capital and Development as borrowers, the First Lien Agent and the First Lien Lenders, pursuant to which the First Lien Lenders extended term loans to Utah 7000, Capital and Development in the aggregate principal amount of $275 million.

"First Lien Credit Documents" means collectively, the First Lien Credit Agreement and all other agreements, instruments, notes, guaranties and other documents executed in connection therewith, including, without limitation, the First Lien Guaranty, the First Lien Hedging Agreement, and all collateral and security documents executed by the Debtors in favor of the First Lien Agent and the First Lien Lenders.

"First Lien Guaranty" means that certain Guaranty Agreement dated as of August 31, 2005, by and among Cabins, Realty and TRC and the First Lien Agent (on behalf of itself

9

NOTICE: NO DISCLOSURE STATEMENT HAS
BEEN APPROVED FOR THIS PLAN.
NO ACCEPTANCES OR REJECTIONS OF THIS
PLAN MAY BE SOLICITED AT THIS TIME

and the First Lien Lenders), pursuant to which Cabins, Realty and TRC jointly, severally, unconditionally and irrevocably guaranteed to the First Lien Agent and the First Lien Lenders the prompt payment when due and timely performance of all First Lien Obligations.

"First Lien Hedging Agreement" means that certain confirmation entered into by Utah 7000, Capital and Development, on the one hand, and Credit Suisse International on the other, dated as of March 3, 2006 (as amended, restated, supplemented or otherwise modified from time to time).

"First Lien Lender Claims" means the aggregate amount of the First Lien Obligations jointly and severally owing by each of the Debtors under the First Lien Credit Agreement and the other First Lien Credit Documents as of the Effective Date, including (i) $268,812,500 in principal obligations owing under the First Lien Credit Agreement, (ii) all accrued and unpaid interest owing under the First Lien Credit Agreement, (iii) $10,318,450.48 owing by the Debtors on account of the Termination Liability, (iv) all accrued and unpaid interest on the Termination Liability, (v) all accrued and unpaid fees and expenses (including, without limitation, professional fees and expenses of the First Lien Agent) that are chargeable or reimbursable under the First Lien Credit Documents, and (vi) all other fees, charges and expenses that are chargeable or reimbursable under the First Lien Credit Documents, in each case to the maximum extent allowable under section 506(b) of the Bankruptcy Code. The First Lien Lender Claims shall include any Section 507(b) Claims that may be asserted by the First Lien Lenders.

"First Lien Lenders" means the lenders party from time to time to the First Lien Credit Agreement.

"First Lien Obligations" means all obligations of the Debtors arising under the First Lien Credit Agreement or any other First Lien Credit Document, including all loans, advances, debts, liabilities, fees, charges, expenses and obligations for the performance of covenants, tasks or duties, or for the payment of monetary amounts owing to the First Lien Agent or the First Lien Lenders, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, including, without limitation, the Termination Liability.

"General Unsecured Claims" means all Claims that do not qualify as either Administrative Expense Claims, Convenience Claims, First Lien Lender Claims, Intercompany Claims, Other Secured Claims, Priority Non-Tax Claims, Priority Tax Claims, Professional Compensation Claims, or Second Lien Lender Claims. For the avoidance of doubt, the General Unsecured Claims shall not include any Unsecured Claims held by the First Lien Lenders or the Second Lien Lenders.

"General Unsecured Claim Recovery Fund" means the sum of $1,500,000 in cash (less any Distributions paid to Holders of Allowed Convenience Claims), which amount shall be available on the Effective Date for Distribution to the Holders of Allowed General Unsecured Claims under this Plan.

10

NOTICE: NO DISCLOSURE STATEMENT HAS
BEEN APPROVED FOR THIS PLAN.
NO ACCEPTANCES OR REJECTIONS OF THIS
PLAN MAY BE SOLICITED AT THIS TIME

"GMAC Vehicle Claims" means the Other Secured Claims of GMAC (doing business through Power Chevrolet Superstition Springs) against Development, which Claims are secured by five (5) 2007 Chevrolet Suburban vehicles currently used by the Debtors.

"Holder" means any Person holding a Claim or an Equity Interest.

"Initial Distribution Date" means the first Business Day that is ten (10) days after the Effective Date for all classes other than Class 5. With respect to Class 5, the Initial Distribution Date shall be the first Business Day that is ten (10) days after the Disputed Claims Reserve Account is funded pursuant to Section 7.7 of this Plan.

"Intercompany Claim" means a Claim by a Debtor against another Debtor.

"Intercreditor Agreement" means that certain Intercreditor Agreement dated as of August 31, 2005, by and between the First Lien Agent and the Second Lien Agent, which governs the lien priorities of the First Lien Lenders and the Second Lien Lenders.

"Land Rover Vehicle Claims" means the Other Secured Claims of Land Rover Capital Group against Development, which Claims are secured by six (6) Land Rover vehicles currently used by the Debtors.

"LIBOR" means the one month London Inter-Bank Offered Rate, as reported in The Wall Street Journal on any date of determination.

"Lien" means, with respect to any interest in property, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind affecting such interest in property.

"Local Rules" means the Local Rules of the United States Bankruptcy Court for the District of Utah, as amended.

"Materialmen" means contractors, subcontractors, and all other Persons performing any services or furnishing any materials or equipment used in the construction, alteration or improvement of any building, structure or improvement to any premises at the Project in any manner, as provided in Utah Code § 38-1-3 or otherwise applicable non-bankruptcy law.

"Mechanics Lien Claims" means all Other Secured Claims that are asserted by Materialmen. All Secured Claims asserted by Materialmen that were junior in Lien priority to the First Lien Lender Claims as of the Petition Date shall not be Mechanics Lien Claims and shall instead be treated as General Unsecured Claims under this Plan.

"Mountain Regional Water Special Services District Secured Claims" means all Other Secured Claims against Utah 7000 and Development held by the Mountain Regional Water Special Services District relating to its Assessment Ordinance No. 454 and the Series 2003 special bonds issued in connection therewith.

11

NOTICE: NO DISCLOSURE STATEMENT HAS
BEEN APPROVED FOR THIS PLAN.
NO ACCEPTANCES OR REJECTIONS OF THIS
PLAN MAY BE SOLICITED AT THIS TIME

"NewCo" means a newly-formed Delaware corporation or limited liability company that shall (a) be the holding company for the Reorganized Debtors, (b) issue the New Common Stock and, if applicable, the New Warrants on the Effective Date, and (c) guaranty the New Secured Notes.

"NewCo Bylaws" means the bylaws or limited liability operating agreement of NewCo, the form of which shall be included in the Plan Supplement.

"NewCo Certificate of Incorporation" means the certificate of incorporation or certificate of formation of NewCo, the form of which shall be included in the Plan Supplement.

"New Common Stock" means (a) the common stock of NewCo, par value $0.01 per share, or (b) the common membership interests if NewCo is a limited liability company, to be issued on the Effective Date pursuant to Section 6.8 of this Plan.

"New Intercreditor Agreement" means an intercreditor agreement between the participants in the Exit Financing and the recipients of the New Secured Notes, pursuant to which the Liens and Claims under the New Secured Notes shall be subordinated to the Liens and Claims under the Exit Financing. The Plan Supplement shall include the material terms of the New Intercreditor Agreement as of the date of the Plan Supplement.

"New Membership Interests" means the new limited liability company membership interests to be issued by each Reorganized Debtor on the Effective Date.

"New Secured Notes" means, subject to further analysis and market considerations, new secured notes in an anticipated principal amount of $[90] million to be (a) issued by the Reorganized Debtors on the Effective Date and (b) guaranteed by NewCo. In response to further analysis and market considerations the principal amount of the New Secured Notes may be substantially reduced or eliminated. Subject to further analysis and market considerations, it is anticipated that the New Secured Notes shall mature on the fourth anniversary of the Effective Date and shall bear interest per annum at the rate of LIBOR plus 7.50%, with the LIBOR portion payable monthly in cash and the remaining 7.50% payable in kind (with PIK interest compounding semi-annually). The New Secured Notes shall be secured by Liens on substantially all assets of NewCo and each Reorganized Debtor that shall be junior only to the Liens securing the Exit Financing and the Liens securing any Other Secured Claims that shall be reinstated and left unimpaired on the Effective Date. The Liens and Claims under the New Secured Notes shall be subordinated to the Liens and Claims under the Exit Financing pursuant to the New Intercreditor Agreement. The Plan Supplement shall include the material terms of the New Secured Notes as of the date of the Plan Supplement.

"New Stockholders Agreement" means an agreement among the recipients of the New Common Stock which may contain "drag along" and "tag along" rights, as well as other reasonable and customary agreements and restrictions. All recipients and transferees of the New Common Stock shall be required to join as parties to the New Stockholders Agreement. All

12

NOTICE: NO DISCLOSURE STATEMENT HAS
BEEN APPROVED FOR THIS PLAN.
NO ACCEPTANCES OR REJECTIONS OF THIS
PLAN MAY BE SOLICITED AT THIS TIME

recipients and transferees of the New Warrants shall be required to join as parties to the New Stockholders Agreement upon exercise of the New Warrants. The Plan Supplement shall include the material terms of the New Stockholders Agreement as of the date of the Plan Supplement.

"New Warrants" means the warrants to be issued by NewCo on the Effective Date to purchase up to 5% of the New Common Stock issued on the Effective Date (as adjusted pursuant to certain anti-dilution provisions). The New Warrants may be exercised, as each New Warrant vests, for an exercise price of $0.01 per vested share of New Common Stock. The New Warrants shall vest as the incremental equity value of NewCo exceeds a threshold value by a specified amount. The threshold value is calculated as (i) the greater of $310,000,000 or the full amount of the First Lien Lender Claims, (ii) less the principal amount of the New Secured Notes issued under the Plan, and (iii) less the amount of all dividends and distributions (other than of New Common Stock paid in kind) actually paid on account of the New Common Stock received by the First Lien Lenders under the Plan. The threshold value shall be adjusted to reflect the dilution of the New Common Stock issued to the First Lien Lenders on the Effective Date by the concurrent or subsequent issuance of New Common Stock to other parties, including the providers of the Exit Financing, if any. The New Warrants shall expire on the earlier of: (i) the fourth anniversary of the Effective Date, (ii) subject to certain qualifications, the date of a sale of substantially all of the assets of NewCo, and (iii) subject to certain qualifications, the day on which more than 50% of the New Common Stock is sold to a person or group of related persons. The material terms of the New Warrants are attached hereto as Exhibit A, and are incorporated herein in their entirety. The Plan Supplement shall include the form of the New Warrants.

"Other Secured Claims" means Secured Claims that were senior in Lien priority to the First Lien Lender Claims as of the Petition Date. All Secured Claims (other than the Second Lien Lender Claims) that were junior in Lien priority to the First Lien Lender Claims as of the Petition Date shall be treated as General Unsecured Claims under this Plan.

"Person" means any person, including, without limitation, any individual, partnership, joint venture, association, corporation, limited liability company, limited liability partnership company, trust, estate, unincorporated organization or governmental unit.

"Petition Date" means the dates on which the Chapter 11 Cases were commenced; specifically (a) with respect to Utah 7000, Development and Capital, March 28, 2008, (b) with respect to Cabins and Realty, April 3, 2008, and (c) with respect to TRC, November 4, 2008.

"Plan" means this Joint Plan of Reorganization Proposed by the Debtors and the First Lien Agent, and all addenda, exhibits, schedules, supplements and other attachments hereto, all of which are incorporated herein by reference, as the same may be amended from time to time.

"Plan Proponents" means collectively the Debtors and the First Lien Agent as the proponents of this Plan within the meaning of section 1127 of the Bankruptcy Code. All decisions, approvals, or other acts to be taken by the Plan Proponents under the Plan shall be

13

NOTICE: NO DISCLOSURE STATEMENT HAS
BEEN APPROVED FOR THIS PLAN.
NO ACCEPTANCES OR REJECTIONS OF THIS
PLAN MAY BE SOLICITED AT THIS TIME

made jointly by the First Lien Agent and Debtors, provided that the consent by the First Lien Agent or Debtors to any such decision, approval or other action will not be unreasonably withheld. The First Lien Agent shall prosecute the Plan subject to the approval by the Requisite First Lien Lenders with respect to any decision, approval or other discretionary act under the Plan. Any Plan Proponent may propose a modification to the Plan. Any proposed modification will be subject to the approval of the other Plan Proponent, which approval may not be unreasonably withheld; provided, however, that a Plan Proponent may, in its sole discretion, withhold approval of any modification that will materially and adversely affect (i) the interests of such Plan Proponent, (ii) the treatment of the General Unsecured Claims, Assumed Obligations or the Promontory Conservancy provided for in this Plan, or (iii) the terms of the Equity Settlement Payment and the associated exchanges of releases, compromises, and settlements provided for in this Plan. If either the Debtors or the First Lien Agent ceases to be a Plan Proponent, in accordance with the terms of Section 11.1 of this Plan, then the remaining Plan Proponent shall be the sole proponent of this Plan.

"Plan Supplement" means the supplemental appendix to the Plan that shall contain the Amended LLC Agreements, the NewCo Certificate of Incorporation, and the NewCo Bylaws, as well as the material terms of the Exit Financing, New Secured Notes, New Intercreditor Agreement, and New Stockholders Agreement as of the date of the Plan Supplement. The Plan Supplement shall also contain the form of the New Warrants. The First Lien Agent shall file the Plan Supplement with the Bankruptcy Court at least five (5) Business Days prior to the last day for parties to object to confirmation of the Plan.

"Priority Non-Tax Claims" means any Claims that are entitled to priority pursuant to section 507(a) of the Bankruptcy Code (other than Administrative Expense Claims, Priority Tax Claims, and Professional Compensation Claims).

"Priority Tax Claims" means any Claims of a governmental unit of the kind entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code.

"Professional Compensation Claim" means any Claims for compensation, indemnification or reimbursement of expenses incurred by any attorneys, financial advisors, and other professionals retained by the Debtors and the Committee pursuant to sections 327, 328, 330, 331 or 503(b) of the Bankruptcy Code in connection with the Chapter 11 Cases.

"Project" means all of the Assets of the Debtors that comprise the master-planned private resort community located on approximately 7,244 acres in the Summit and Wasatch Counties, Utah and known as the Promontory Ranch Club, which the Debtors own, operate and are developing, including all real and personal property owned by the Debtors.

"Pro Rata Share" means, with reference to any Distribution on account of any Allowed Claim in any Class, a Distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Allowed Claim bears to the aggregate amount of all Allowed Claims in the same Class.

14

NOTICE: NO DISCLOSURE STATEMENT HAS
BEEN APPROVED FOR THIS PLAN.
NO ACCEPTANCES OR REJECTIONS OF THIS
PLAN MAY BE SOLICITED AT THIS TIME

"Realty" means Utah 7000 Realty, L.L.C. (f/k/a Pivotal Promontory Realty, L.L.C.), an Arizona limited liability company and one of the Debtors.

"Rejection Claims" means any Claims against the Debtors arising from the rejection of an executory contract or unexpired lease pursuant to the Plan or otherwise, including any Claims of lessors for damages resulting from the rejection of a lease of nonresidential real property calculated in accordance with section 502(b)(6) of the Bankruptcy Code.  All Rejection Claims shall constitute General Unsecured Claims or Convenience Claims for purposes of this Plan.

"Released Parties" has the meaning ascribed to it in Section 8.5 of this Plan.

"Releasing First Lien Lender" has the meaning ascribed to it in Section 8.6 of this Plan.

"Releasing Second Lien Lender" has the meaning ascribed to it in Section 8.6 of this Plan.

"Reorganized Debtors" means, as applicable, each Debtor or the Debtors collectively as they will be reorganized as of the Effective Date in accordance with this Plan.

"Required Plan Payments" means those Claims that are senior to the First Lien Lender Claims and that must be paid in cash and in full on the Effective Date, including but not limited to the DIP Loan Claims.

"Requisite First Lien Lenders" means, as of any date of determination, the First Lien Lenders holding more than 50% of the First Lien Lender Claims as of such date.

"Retained Actions" means all Causes of Action that the Debtors or their Estates could assert immediately prior to the Effective Date, but excluding (i) all Avoidance Actions against parties (other than against the Current Equity Owners (if, but only if, they do not make the Equity Settlement Payment) and other than against each Second Lien Lender (if, but only if, (a) the Class of Second Lien Lenders does not vote to accept the Plan or (b) as to each Second Lien Lender if that lender opts out of the releases contained in Section 8.6 of the Plan)), and (ii) all Causes of Action released, waived, extinguished or assigned (to the limited extent and under the conditions set forth in Section 8.6) pursuant to this Plan or a Final Order of the Bankruptcy Court (such exclusions include any Causes of Action against the Released Parties).

"Sale" "Sale APA", "Sale Motion", "Sale Procedures", and "Sale Qualifying Bid" have the meanings ascribed to them in Section 6.16 of this Plan.

"Schedules" means, with respect to any Debtor, the schedules of assets and liabilities filed by such Debtor with the Bankruptcy Court pursuant to section 521(1) of the

NOTICE: NO DISCLOSURE STATEMENT HAS
BEEN APPROVED FOR THIS PLAN.
NO ACCEPTANCES OR REJECTIONS OF THIS
PLAN MAY BE SOLICITED AT THIS TIME

LA1 1449243v.3

Bankruptcy Code and Bankruptcy Rule 1007(b), as such schedules have been or may be amended or supplemented by the Debtors from time to time.

"Second Lien Agent" means Wells Fargo Bank, N.A. in its capacities as administrative agent and collateral agent under the Second Lien Credit Agreement.

"Second Lien Credit Agreement" means that certain Credit Agreement, dated as of August 31, 2005 (as amended, restated, supplemented or otherwise modified from time to time), by and among Utah 7000, Capital and Development as borrowers, the Second Lien Agent and the Second Lien Lenders, pursuant to which the Second Lien Lenders extended term loans to Utah 7000, Capital and Development in the aggregate principal amount of $75 million.

"Second Lien Lender Claims" means the aggregate amount of the obligations jointly and severally owing by each of the Debtors under the Second Lien Credit Agreement as of the Effective Date, including (i) $75,000,000 in principal obligations owing under the Second Lien Credit Agreement, (ii) all accrued and unpaid interest payable under the Second Lien Credit Agreement, (iii) all accrued and unpaid fees and expenses (including, without limitation, professional fees and expenses of the Second Lien Agent) that are chargeable or reimbursable under the Second Lien Credit Documents, and (iv) all other fees, charges and expenses that are chargeable or reimbursable under the Second Lien Credit Agreement, in each case to the extent allowable under section 506(b) of the Bankruptcy Code. The Second Lien Lenders Claims shall include any Section 507(b) Claims that may be asserted by the Second Lien Lenders.

"Second Lien Lenders" means the lenders from time to time party to the Second Lien Credit Agreement.

"Second Lien Obligations" means all obligations of the Debtors arising under the Second Lien Credit Agreement, including all loans, advances, debts, liabilities, fees, charges, expenses and obligations for the performance of covenants, tasks or duties, or for the payment of monetary amounts owing to the Second Lien Agent or the Second Lien Lenders, of any kind or nature, whether or not evidenced by any note, agreement or other instrument.

"Section 507(b) Claims" means any Claims allowable under section 507(b) of the Bankruptcy Code.

"Secured Claims" means any Claims secured by valid, perfected and non-avoidable Liens on Collateral to the extent of the value of such Collateral (a) as set forth in this Plan, (b) as agreed to by the Holder of such Claim and the Plan Proponents, or (c) as determined by a Final Order of the Bankruptcy Court in accordance with section 506(a) of the Bankruptcy Code or, in the event that such Claim is subject to setoff under section 553 of the Bankruptcy Code, to the extent of such setoff. All Secured Claims that do not qualify as Other Secured Claims shall be treated as General Unsecured Claims under this Plan.

16

NOTICE: NO DISCLOSURE STATEMENT HAS
BEEN APPROVED FOR THIS PLAN.
NO ACCEPTANCES OR REJECTIONS OF THIS
PLAN MAY BE SOLICITED AT THIS TIME

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Termination Liability" means the termination liability arising under the First Lien Hedging Agreement based on the failure of Utah 7000, Capital and Development to timely pay the monthly amount due under the First Lien Hedging Agreement on February 6, 2008, as a result of which non-payment Credit Suisse International terminated the First Lien Hedging Agreement.

"TRC" means Pivotal Promontory TRC, L.L.C., an Arizona limited liability company and one of the Debtors.

"Unsecured Claims" means any Claims that are not Secured Claims, First Lien Lender Claims, Second Lien Lender Claims, Priority Non-Tax Claims, Priority Tax Claims, or Administrative Expense Claims.

"Utah 7000" means Utah 7000, L.L.C. (f/k/a Pivotal Promontory, L.L.C.), an Arizona limited liability company and one of the Debtors

     **B.**    **Interpretation.** For purposes of this Plan: (a) whenever appropriate, each term stated herein, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) unless otherwise provided in this Plan, any reference in this Plan to an existing document or exhibit means such document or exhibit, as it may have been or may be amended, modified or supplemented pursuant to this Plan; (d) unless otherwise specified herein, any reference to an entity as a holder of a Claim includes that entity's successors, assigns and affiliates; (e) unless otherwise specified, all references in this Plan to Sections, Articles, schedules and exhibits are references to Sections, Articles, schedules and exhibits of or to this Plan; (f) the words "herein", "hereto" and "hereunder" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) captions and headings to Articles and Sections of this Plan are inserted for convenience of reference only and are not intended to limit or otherwise affect the provisions of this Plan; and (h) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the construction of this Plan.

     **C.**    **Computation of Time.** In computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

17

**NOTICE: NO DISCLOSURE STATEMENT HAS BEEN APPROVED FOR THIS PLAN. NO ACCEPTANCES OR REJECTIONS OF THIS PLAN MAY BE SOLICITED AT THIS TIME**

# ARTICLE II

## CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

Pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code, the categories of Claims and Equity Interests set forth below classify all Claims against and Equity Interests in each of the Debtors for all purposes, including voting and Distributions pursuant to the Plan. A Claim or Equity Interest shall be deemed classified in a particular Class for purposes of voting on, and of receiving Distributions pursuant to, this Plan only to the extent that such Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest shall be deemed to be in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date.

NOTHING IN THE PLAN OR THE DISCLOSURE STATEMENT SHALL CONSTITUTE OR BE DEEMED TO CONSTITUTE AN ADMISSION THAT ANY ONE OF THE DEBTORS IS SUBJECT TO OR LIABLE FOR ANY CLAIM AGAINST ANY OTHER DEBTOR. A CLAIM AGAINST MULTIPLE DEBTORS, TO THE EXTENT ALLOWED IN EACH DEBTOR'S CHAPTER 11 CASE, SHALL BE TREATED AS A SINGLE CONSOLIDATED CLAIM FOR ALL PURPOSES, INCLUDING, BUT NOT LIMITED TO, VOTING AND DISTRIBUTIONS UNDER THIS PLAN.

The classification of Claims against and Equity Interests in the Debtors pursuant to this Plan is as follows:

| Class | Claim/Interest | Status | Entitled to Vote |
|-------|----------------|--------|------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | No |
| 2 | Other Secured Claims | Unimpaired | No |
| 3 | First Lien Lender Claims | Impaired | Yes |
| 4 | Second Lien Lender Claims | Impaired | Yes |
| 5 | General Unsecured Claims | Impaired | Yes |
| 6 | Convenience Claims | Unimpaired | No |
| 7 | Intercompany Claims | Impaired | No |
| 8 | Equity Interests | Impaired | No |

In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Loan Claims, Administrative Expense Claims, Priority Tax Claims, and Professional Compensation Claims have not been classified and are excluded from the foregoing Classes.

18

NOTICE: NO DISCLOSURE STATEMENT HAS
BEEN APPROVED FOR THIS PLAN.
NO ACCEPTANCES OR REJECTIONS OF THIS
PLAN MAY BE SOLICITED AT THIS TIME

## ARTICLE III

## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

3.1.    <u>Class 1 -- Priority Non-Tax Claims</u>.

(A)    <u>Classification</u>. Class 1 consists of all Priority Non-Tax Claims.

(B)    <u>Allowance</u>. Claims in Class 1 shall be allowed or disallowed in accordance with Section 7.4 of this Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

(C)    <u>Treatment</u>. The legal, equitable and contractual rights of the Holders of Allowed Priority Non-Tax Claims shall remain unaltered by this Plan. On the Effective Date, except to the extent a Holder of an Allowed Priority Non-Tax Claim and the First Lien Agent (or, following the closing of the Sale, the Acquirer) agree to a different treatment of such Claim (in which event such agreement shall govern), each Holder of an Allowed Priority Non-Tax Claim shall receive on account of and in full and complete settlement, release and discharge of such Claim, at the First Lien Agent's election (or, following the closing of the Sale, the Acquirer), (i) cash in the amount of such Allowed Priority Non-Tax Claim in accordance with section 1129(a)(9) of the Bankruptcy Code or (ii) such other treatment required to render such Claim unimpaired pursuant to section 1124 of the Bankruptcy Code. All Allowed Priority Non-Tax Claims which are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors when such Claims become due and payable in accordance with the terms thereof.

(D)    <u>Impairment and Voting</u>. Class 1 is unimpaired and the Holders of Claims in Class 1 are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Claims in Class 1 are not entitled to vote to accept or reject this Plan.

3.2.    <u>Class 2 -- Other Secured Claims</u>.

(A)    <u>Classification</u>. Class 2 consists of all Other Secured Claims, including, without limitation, the Brown Stembridge Note Claims, the GMAC Vehicle Claims, the Land Rover Vehicle Claims, the Mountain Regional Water Special Services District Secured Claims, and all Mechanics Lien Claims.

(B)    <u>Allowance</u>. Claims in Class 2 shall be allowed or disallowed in accordance with Section 7.4 of this Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

(C)    <u>Treatment</u>. Each Allowed Other Secured Claim shall, at the sole option of the First Lien Agent (or, following the closing of the Sale, the Acquirer), be treated as

19

NOTICE: NO DISCLOSURE STATEMENT HAS
BEEN APPROVED FOR THIS PLAN.
NO ACCEPTANCES OR REJECTIONS OF THIS
PLAN MAY BE SOLICITED AT THIS TIME

follows: (i) the Plan will leave unaltered the legal, equitable and contractual rights to which such Claim entitles the Holder thereof, (ii) the Reorganized Debtors shall either (x) surrender all Collateral securing such Allowed Other Secured Claim to the Holder thereof as soon as practicable after the Effective Date, without representation or warranty by or recourse against the Debtors or the Reorganized Debtors and in full and complete settlement, release and discharge of such Claim, or (y) pay to the Holder thereof as soon as practicable after the Effective Date the full amount of their Allowed Other Secured Claim in full and complete settlement, release and discharge of such Claim, or (iii) notwithstanding any contractual provision or applicable law that entitles the Holder of an Allowed Other Secured Claim to demand or receive payment of such Claim prior to the stated maturity of such Claim from and after the occurrence of a default, such Allowed Other Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code. Notwithstanding the foregoing options "i" and "ii", the Brown Stembridge Note Claims, the GMAC Vehicle Claims, the Land Rover Vehicle Claims, and the Mountain Regional Water Special Services District Secured Claims shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code.

(D)    Impairment and Voting. Class 2 is unimpaired and the Holders of Claims in Class 2 are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Claims in Class 2 are not entitled to vote to accept or reject this Plan.

3.3.    Class 3 -- First Lien Lender Claims.

(A)    Classification. Class 3 consists of all First Lien Lender Claims.

(B)    Allowance. The First Lien Lender Claims shall be deemed allowed on the Effective Date pursuant to this Plan.

(C-1)    Treatment. If the Alternative B set forth in Section 6.16 of the Plan does not apply, then the following shall govern the treatment of Class 3:

Each Holder of an Allowed First Lien Lender Claim shall receive, on account of and in full and complete settlement, release and discharge of such Claim, on the Effective Date, (a) such Holder's Pro Rata Share of (i) the New Secured Notes, and (ii) the New Common Stock, and (b) the releases set forth in Sections 8.5 and (unless such Holder opts out) 8.6 of this Plan. Further, the fees and expenses of attorneys and financial advisors retained by the First Lien Agent in connection with the Chapter 11 Cases shall be paid in full in cash to the First Lien Agent on the Effective Date. Finally, the unsecured portion of the First Lien Lender Claims (i.e. the portion that is not a Secured Claim) shall share on a pro rata basis with the unsecured portion of the Second Lien Lender Claims in the proceeds of any litigation provided for in Section 8.3(C)(4) of the Plan.

(C-2)    Alternative B Treatment. If the Alternative B set forth in Section 6.16 of the Plan applies, then the following shall govern the treatment of Class 3:

20

NOTICE: NO DISCLOSURE STATEMENT HAS
BEEN APPROVED FOR THIS PLAN.
NO ACCEPTANCES OR REJECTIONS OF THIS
PLAN MAY BE SOLICITED AT THIS TIME

Each Holder of an Allowed First Lien Lender Claim shall receive, on account of and in full and complete settlement, release and discharge of such Claim, on the Effective Date, (a) the releases set forth in Sections 8.5 and (unless such Holder opts out) 8.6 of this Plan; and (b) with respect to the unsecured portion of the Allowed First Lien Lender Claims (i.e. the portion that is not a Secured Claim) a Pro Rata Share with the unsecured portion of the Allowed Second Lien Lender Claims in the proceeds of any litigation provided for in Section 8.3(C)(4) of the Plan. In addition, each Holder of an Allowed First Lien Lender Claim shall receive either (i) if the First Lien Lenders credit bid under the auction process and are the Acquirer, then such Holder's Pro Rata Share of the New Common Stock, or (ii) if a Person other than the First Lien Lenders is the Acquirer under the auction process, then such Holder's Pro Rata Share of the proceeds from the Sale less the Required Plan Payments. Further, the fees and expenses of attorneys and financial advisors retained by the First Lien Agent in connection with the Chapter 11 Cases shall be paid in full in cash to the First Lien Agent on the Effective Date, provided, however, that, if the First Lien Lenders are not the Acquirer, such payment shall be in an amount equal to $2.2 million.

(D)     Impairment and Voting. Class 3 is impaired and, pursuant to section 1126 of the Bankruptcy Code, each Holder of a First Lien Lender Claim in Class 3 shall be entitled to vote to accept or reject this Plan.

3.4.     Class 4 -- Second Lien Lender Claims.

(A)     Classification. Class 4 consists of all Second Lien Lender Claims.

(B)     Allowance. The Second Lien Lender Claims shall be deemed allowed on the Effective Date pursuant to this Plan.

(C-1)     Treatment. If the Alternative B set forth in Section 6.16 of the Plan does not apply, then the following shall govern the treatment of Class 4:

The treatment of the Second Lien Lender Claims under this Plan depends on whether the Second Lien Lenders vote as a Class to accept or reject the Plan. If the Second Lien Lenders vote as a Class to accept the Plan, each Holder of an Allowed Second Lien Lender Claim shall receive, on account of and in full and complete settlement, release and discharge of such Claim, on the Initial Distribution Date, (a) such Holder's Pro Rata Share of the New Warrants, and (b) the releases set forth in Sections 8.5 and (unless such Holder opts out) 8.6 of this Plan. In addition, if both (i) the Second Lien Lenders vote as a Class to accept this Plan, and (ii) both the Second Lien Agent and at least 2/3 in dollar amount of the Second Lien Lenders do not opt out of the releases contained in Section 8.6 of this Plan, then the fees and expenses of attorneys and financial advisors retained by the Second Lien Agent (including without limitation Durham Jones & Pinegar; Akin Gump Strauss Hauer & Feld LLP; and Ropes & Gray LLP) in connection with the Chapter 11 Cases shall be paid in cash in an amount not to exceed $1,500,000. The Second Lien Agent shall provide summary invoices to the Debtors (subject to redactions necessary to preserve applicable privileges) (a) for the period through March 12, 2009

21

NOTICE: NO DISCLOSURE STATEMENT HAS
BEEN APPROVED FOR THIS PLAN.
NO ACCEPTANCES OR REJECTIONS OF THIS
PLAN MAY BE SOLICITED AT THIS TIME

(the scheduled Confirmation Hearing), no later than March 22, 2009 and (b) for the period after March 12, 2009 within five (5) Business Days of the Effective Date. The Debtors shall have ten (10) business days after receipt to review such invoices, which review shall be limited to determining that the fees and expenses reflected in the invoices were incurred in connection with the Debtors and their Chapter 11 Cases. Payment is conditioned on Plan effectiveness, and shall be made (a) on the Effective Date, for the invoices through March 12, 2009, and (b) within fifteen Business Days after the Effective Date, for the period after March 12, 2009. Finally, whether or not the Second Lien Lenders vote as a Class to accept the Plan, the unsecured portion of the Second Lien Lender Claims (i.e. the portion that is not a Secured Claim) shall share on a pro rata basis with the unsecured portion of the First Lien Lender Claims in the proceeds of litigation provided for in Section 8.3(C)(4) of the Plan.

On the other hand, if the Second Lien Lenders vote as a Class to reject this Plan, each Holder of a Second Lien Lender Claim shall receive only a Pro Rata distribution of the proceeds of litigation provided for in Section 8.3(C)(4) of the Plan, the Intercreditor Agreement shall remain in full force and effect, and the First Lien Agent and the First Lien Lenders shall preserve and retain all rights and remedies under the Intercreditor Agreement pursuant to Section 6.9 of the Plan, as well as all claims and causes of action against the Second Lien Lenders released in Section 8.6 of the Plan, and the Second Lien Lenders will not be released from Claims and Causes of Action by the Debtors or their Estates (including for Avoidance Actions that could be asserted for purposes of section 502(d) of the Bankruptcy Code), which shall, in the event the Second Lien Lenders vote as a Class to reject this Plan, constitute Retained Actions against the Second Lien Lenders.

(C-2)   Alternative B Treatment. If the Alternative B set forth in Section 6.16 of the Plan applies, then the following shall govern the treatment of Class 4:

Each Holder of an Allowed Second Lien Lender Claim shall receive the treatment provided for in Section 3.4(C-1) above except that, instead of receiving a Pro Rata Share of the New Warrants, each Holder shall receive its Pro Rata Share of the excess proceeds from the Sale, if any, remaining after the First Lien Lender Claims have been paid in full and the Required Plan Payments have been made.

(D)   Impairment and Voting. Class 4 is impaired and, pursuant to section 1126 of the Bankruptcy Code, each Holder of a Second Lien Lender Claim in Class 4 shall be entitled to vote to accept or reject this Plan.

3.5.   Class 5 -- General Unsecured Claims.

(A)   Classification. Class 5 consists of all General Unsecured Claims.

(B)   Allowance. Claims in Class 5 shall be allowed or disallowed in accordance with Sections 7.4 and 7.7 of this Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

22

NOTICE: NO DISCLOSURE STATEMENT HAS
BEEN APPROVED FOR THIS PLAN.
NO ACCEPTANCES OR REJECTIONS OF THIS
PLAN MAY BE SOLICITED AT THIS TIME

(C)   Treatment. Each Holder of an Allowed General Unsecured Claim shall receive, on account of and in full and complete settlement, release and discharge of such Claim, on the later of (i) the Initial Distribution Date or (ii) the first Distribution Date after the date on which such General Unsecured Claim becomes an Allowed Claim, such Holder's Pro Rata Share of the General Unsecured Claim Recovery Fund; provided, however, that under no circumstances shall any Holder's Pro Rata Share of the General Unsecured Claim Recovery Fund exceed 100% of such Holder's Allowed General Unsecured Claim. Any portion of the General Unsecured Claim Recovery Fund that is not distributed to the Holders of Allowed General Unsecured Claims shall be returned to the Reorganized Debtors. If a Holder of a Claim in Class 5 asserts otherwise identical General Unsecured Claims against more than one Debtor, no more than one such General Unsecured Claim shall be treated as Allowed for purposes of receiving distributions from the General Unsecured Claim Recovery Fund.

(D)   Impairment and Voting. Class 5 is impaired and, pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed General Unsecured Claim shall be entitled to vote to accept or reject this Plan.

3.6.   Class 6 -- Convenience Claims.

(A)   Classification. Class 6 consists of all Convenience Claims.

(B)   Allowance. Claims in Class 6 shall be allowed or disallowed in accordance with Section 7.4 of this Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

(C)   Treatment. Each Holder of an Allowed Convenience Claim shall receive, on account of and in full and complete settlement, release and discharge of such Claim, on the later of (i) the Initial Distribution Date or (ii) the first Distribution Date after the date on which such Convenience Claim becomes an Allowed Claim, payment of cash in the amount equal to 100% of such Allowed Convenience Claim. If a Holder of a Claim in Class 6 asserts otherwise identical Convenience Claims against more than one Debtor, no more than one such Convenience Claim shall be treated as Allowed for purposes of receiving distributions under this Section 3.6(C).

(D)   Convenience Claim Election. Each Holder of an Unsecured Claim in an amount greater than $1,000 may elect to voluntarily reduce its Unsecured Claim to $1,000 and be treated as the Holder of a Convenience Claim for purposes of this Plan by designation on such Holder's timely-submitted Ballot.

(E)   Impairment and Voting. Class 6 is unimpaired and the Holders of Claims in Class 6 are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Claims in Class 6 are not entitled to vote to accept or reject this Plan.

23

NOTICE: NO DISCLOSURE STATEMENT HAS
BEEN APPROVED FOR THIS PLAN.
NO ACCEPTANCES OR REJECTIONS OF THIS
PLAN MAY BE SOLICITED AT THIS TIME

3.7.    Class 7 -- Intercompany Claims.

(A)    Classification. Class 7 consists of all Intercompany Claims.

(B)    Allowance. Claims in Class 7 shall be deemed allowed pursuant to this Plan.

(C)    Treatment. Intercompany Claims shall, at the Reorganized Debtors' election, either be (a) unimpaired; (b) subordinated to all other Claims or (c) cancelled and extinguished on the Effective Date. The Holders of Intercompany Claims shall not be entitled to receive or retain any property on account of such Claims.

(D)    Impairment and Voting. Class 7 is either unimpaired and conclusively presumed to have accepted the Plan, or impaired, in which case because the Holders of Intercompany Claims are receiving no Distributions under this Plan, Holders of Intercompany Claims are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. In either instance the members of Class 7 are not entitled to vote to accept or reject the Plan.

3.8.    Class 8 -- Equity Interests.

(A)    Classification. Class 8 consists of all Equity Interests in the Debtors.

(B)    Allowance. Equity Interests in each Debtor shall be deemed allowed on the Effective Date pursuant to this Plan.

(C)    Treatment. Equity Interests in the Debtors shall be cancelled and duly extinguished on the Effective Date, and the Holders of Equity Interests in the Debtors shall not be entitled to receive or retain any property on account of such Equity Interests.

(D)    Impairment and Voting. Class 8 is impaired, but because the Holders of Equity Interests in the Debtors are receiving no Distributions under this Plan, Holders of Equity Interests are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code and are thus not entitled to vote to accept or reject the Plan.

## ARTICLE IV

## TREATMENT OF UNCLASSIFIED CLAIMS

4.1.    Summary. Pursuant to section 1123(a)(1) of the Bankruptcy Code, DIP Loan Claims, Administrative Expense Claims, Priority Tax Claims, and Professional Compensation Claims are not classified for purposes of voting on, or receiving Distributions under, this Plan, and the Holders of such unclassified Claims are thus not entitled to vote to

24

NOTICE: NO DISCLOSURE STATEMENT HAS
BEEN APPROVED FOR THIS PLAN.
NO ACCEPTANCES OR REJECTIONS OF THIS
PLAN MAY BE SOLICITED AT THIS TIME

accept or reject the Plan. All such Claims are instead treated separately in accordance with this Article IV and the requirements set forth in section 1129(a)(9)(A) of the Bankruptcy Code.

4.2.    <u>DIP Loan Claims</u>.  All DIP Loan Claims shall be paid in full in cash on the Effective Date with the proceeds of the Exit Financing or, in the event Alternative B applies, the Sale proceeds. Upon such payment, all Liens securing the DIP Loan Claims shall be released.

4.3.    <u>Administrative Expense Claims</u>.  Subject to certain additional requirements for professionals set forth in Section 4.5 of this Plan, the Reorganized Debtors will pay to each Holder of an Allowed Administrative Expense Claim, on account of and in full and complete settlement, release and discharge of such Claim, cash equal to the full unpaid amount of such Allowed Administrative Expense Claim on either (a) the latest of (i) the Initial Distribution Date, (ii) the date such Claim becomes an Allowed Administrative Expense Claim, or (iii) such other date as may be agreed upon by the First Lien Agent (or, in the event Alternative B applies, the Acquirer) and the Holder of such Claim, or (b) such other date as the Bankruptcy Court may order; <u>provided</u>, <u>however</u>, that Allowed Administrative Expense Claims incurred by the Debtors in the ordinary course of business (including Administrative Expense Claims of governmental units for taxes) shall be assumed by the Reorganized Debtors on the Effective Date and paid, performed or otherwise settled by the Reorganized Debtors when due in accordance with the terms and conditions of the particular agreements or non-bankruptcy law governing such obligations.

4.4.    <u>Priority Tax Claims</u>.  Unless otherwise agreed by the First Lien Agent (or, in the event Alternative B applies, the Acquirer) and the Holder of an Allowed Priority Tax Claim (in which event such other agreement shall govern), each Holder of an Allowed Priority Tax Claim against any of the Debtors that is due and payable on or before the Effective Date shall receive, on account of and in full and complete settlement, release and discharge of such Claim, cash equal to the amount of such Allowed Priority Tax Claim on the later of the Initial Distribution Date and the date such Priority Tax Claim becomes an Allowed Claim, or as soon thereafter as practicable. All Allowed Priority Tax Claims against any of the Debtors which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business by the Reorganized Debtors in accordance with the terms thereof or accorded such other treatment as may be permitted under section 1129(a)(9) of the Bankruptcy Code.

4.5.    <u>Professional Compensation Claims</u>.  All Persons seeking an award by the Bankruptcy Court of a Professional Compensation Claim incurred through and including the Effective Date are required (unless otherwise ordered by the Bankruptcy Court) to file final applications for the allowance of compensation for services rendered and reimbursement of expenses incurred within thirty (30) days after the Effective Date. Holders of Professional Compensation Claims that file final applications in accordance with the Plan will be paid in full in cash in the amounts approved by the Bankruptcy Court:  (a) on or as soon as reasonably practicable following the later to occur of (i) the Effective Date and (ii) the date on which the order relating to the allowance of any such Professional Compensation Claim is entered; or (b)

25

NOTICE: NO DISCLOSURE STATEMENT HAS
BEEN APPROVED FOR THIS PLAN.
NO ACCEPTANCES OR REJECTIONS OF THIS
PLAN MAY BE SOLICITED AT THIS TIME

on such other terms mutually agreed upon by the Plan Proponents (or in the event of Alternative B, the Acquirer) and the Holder of an Allowed Professional Compensation Claim.

## ARTICLE V

### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

5.1.    Assumption or Rejection of Executory Contracts and Unexpired Leases.

(A)    Rejected Contracts and Leases.  On the Effective Date, all executory contracts and unexpired leases to which any of the Debtors is a party shall be deemed rejected in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except those executory contracts, unexpired leases, and other obligations that (i) have previously been assumed by the Debtors pursuant to an order of the Bankruptcy Court, (ii) are the subject of a motion to assume filed by the Debtors at any time prior to the Effective Date, or (iii) that are Assumed Obligations listed in the Contract Assumption Schedule.  The First Lien Agent may identify additional executory contracts, unexpired leases, and other obligations to be assumed and reserve the right to seek such assumption at any time prior to the Effective Date.  The Debtors shall not seek the assumption of any executory contract or unexpired lease without the approval of the First Lien Agent.

(B)    Assumed Obligations.  Entry of the Confirmation Order shall constitute approval by the Bankruptcy Court of the Reorganized Debtors' or Acquirer's assumption of the Assumed Obligations listed in the Contract Assumption Schedule, as of the Effective Date pursuant to section 365(a) of the Bankruptcy Code.

(C)    Club Member and Lot and Home Purchase Agreements.  The Contract Assumption Schedule shall include all existing contracts (which contracts shall be treated as executory contracts for purposes of section 365 of the Bankruptcy Code) with (a) the members of the Club, as set forth in the membership plan and the individual membership agreements (including all obligations to honor membership deposits and club credits), (b) the owners of lots or homes at the Project, and (c) the parties to lot or home purchase agreements with the Debtors (including all warranty provisions under such home purchase agreements).  As part of the adequate assurance of future performance the Reorganized Debtor shall pay to the Promontory Conservancy on the Effective Date the amount of $1,000,000 for future operations. The Contract Assumption Schedule shall also provide that no monetary or non-monetary defaults by the Debtors currently exist under or with respect to such contracts (including, without limitation, any claims for fraud or misrepresentation that may be asserted by the non-Debtor parties to such contracts) or, alternatively, that the assumption of such contracts shall satisfy or eliminate any damage claims that the non-Debtor parties thereto may be able to assert as to such existing defaults, without the necessity of paying any Cure Amounts to such non-Debtor parties on the Effective Date.  Any non-Debtor party to the foregoing agreements who disagrees with the provisions hereof must file an objection to assumption in accordance with Section 5.3.

26

NOTICE: NO DISCLOSURE STATEMENT HAS
BEEN APPROVED FOR THIS PLAN.
NO ACCEPTANCES OR REJECTIONS OF THIS
PLAN MAY BE SOLICITED AT THIS TIME

As a result of the assumption and assignment of the Club membership plan and membership agreements, the Reorganized Debtors or the Acquirer, if applicable, will comply with such plan and agreements, including the right of first refusal provided to members of the Club to purchase the Club facilities, which right of first refusal will not be triggered by the transfers which shall occur on the Effective Date.

(D)     Right to Reject Assumed Obligations. Notwithstanding anything to the contrary in this Section 5.1, the Reorganized Debtors or the Acquirer, as applicable, must assume the following contracts and agreements unless, with respect to such contract or other agreement, either (i) there is a dispute as to the Cure Amount, or (ii) the non-Debtor party otherwise objects to assumption: (a) all obligations of the Debtors to members of the Club as set forth in the membership plan and the individual membership agreements (including all obligations to honor membership deposits and club credits); (b) the Debtors' obligations to purchasers under lot and home purchase agreements for real properties within the Project, including warranty obligations related thereto; (c) the Debtors' governmental and entitlement rights and obligations vis-à-vis Summit County, Utah and other local governmental entities with respect to zoning and completion of infrastructure at the Project; and (d) the Brown Stembridge Note Claims, the GMAC Vehicle Claims, the Land Rover Vehicle Claims, and the Mountain Regional Water Special Services District Secured Claims. If there is either a dispute as to the Cure Amount, or the non-Debtor party otherwise objects to assumption, then the First Lien Agent or the Reorganized Debtors, as applicable, shall have the right to abandon the assumption of any contract or agreement listed on the Contract Assumption Schedule (including any contracts or agreements specified in this Section 5.1(D) or any Assumed Obligations and agreements described in Section 5.1(C) above), and to treat such contract or agreement as rejected under the Plan at any time during the pendency of such dispute as to the Cure Amount or such objection by the non-Debtor party to assumption.

5.2.     Payment of Cure Amounts. The Contract Assumption Schedule shall list the proposed Cure Amount, if any, with respect to each Assumed Obligation included therein. Cure Amounts with respect to the Assumed Obligations will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, (i) by payment of the Cure Amount in cash on the Initial Distribution Date or, (ii) in the event a timely objection to assumption of the Assumed Obligation or to the proposed Cure Amount is raised in accordance with Section 5.3 of this Plan, as soon as practicable after the Cure Amount is determined by the Bankruptcy Court in a Final Order, or agreed to by the First Lien Agent (or in the event of Alternative B, the Acquirer) or the Reorganized Debtors, as applicable and the non-Debtor party to the Assumed Obligation.

5.3.     Objections to Assumption and Proposed Cure Amounts.

(A)     Requirement of Timely Objection. If any non-Debtor party to an Assumed Obligation opposes the Reorganized Debtors' or Acquirer's assumption of such Assumed Obligation for any reason (including, but not limited to, (i) the assertion of the existence of a monetary or non-monetary default under such Assumed Obligation, (ii) any dispute as to the Cure Amount set forth in the Contract Assumption Schedule, or (iii) any dispute

27

NOTICE: NO DISCLOSURE STATEMENT HAS
BEEN APPROVED FOR THIS PLAN.
NO ACCEPTANCES OR REJECTIONS OF THIS
PLAN MAY BE SOLICITED AT THIS TIME

as to the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code)), then such non-Debtor party to the Assumed Obligation must file an objection with the Bankruptcy Court no later than the deadline for filing objections to Confirmation of this Plan. Such objection shall be served on the Plan Proponents and the Committee, and shall state (i) the Cure Amount to which such non-Debtor party claims it is entitled; (ii) the amount of the Rejection Claim which such non-Debtor would be able to assert if the Assumed Obligation were rejected by the Debtors; (iii) the nature of any defaults with respect to such Assumed Obligation; and (iv) any other basis upon which the non-Debtor party opposes the assumption of the Assumed Obligation. Pending the Bankruptcy Court's ruling on such an objection, the Assumed Obligation at issue shall be treated as assumed by the Reorganized Debtors unless otherwise ordered by the Bankruptcy Court.

(B)    Consequences of Failure To Object.  Failure to timely file and serve an objection in accordance with this Section 5.3 shall constitute the non-Debtor party's consent to the Reorganized Debtors' assumption of the Assumed Obligation, and a determination by the Bankruptcy Court that, upon the Reorganized Debtors' payment of the Cure Amount (if any), no defaults shall exist under such Assumed Obligation. Any non-Debtor party that fails to object timely to the proposed Cure Amount or to the Debtors' assumption of any contract, unexpired lease, or other obligation to which it is a party shall be forever barred and estopped from asserting any Claims against the Debtors, the Reorganized Debtors, or any Person acting on behalf of the Debtors that arose prior to the Effective Date with respect to such contract or unexpired lease or with respect to any additional agreements, either oral or written, that may be related thereto, including, without limitation, any Claims for fraud or misrepresentation that may be asserted by such non-Debtor party against the Debtors, the Reorganized Debtors, or any Person acting on behalf of the Debtors in connection with, or related to, its contractual relationship with the Debtors, and any such Claims shall be deemed disallowed and discharged under this Plan and shall not be enforceable against the Debtors or the Reorganized Debtors.

5.4.    Rejection Claims Bar Date.  All proofs of claim with respect to Rejection Claims arising from the Debtors' rejection of any executory contract or unexpired lease pursuant to the Plan or otherwise must be filed with the Bankruptcy Court within thirty (30) days after the entry of an order by the Bankruptcy Court, which may be the Confirmation Order, authorizing the rejection of such executory contract or unexpired lease. All Rejection Claims that become Allowed Claims shall be treated as General Unsecured Claims (or Convenience Claims, if applicable). Any Rejection Claims that are not timely filed in accordance with the foregoing provision shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or any property of the Debtors or the Reorganized Debtors unless otherwise ordered by the Bankruptcy Court.

5.5.    Post-Petition Contracts and Leases.  All contracts, agreements and leases that were entered into by the Debtors or assumed by the Debtors after the Petition Date shall be deemed assigned by the Debtors to the Reorganized Debtors on the Effective Date.

NOTICE: NO DISCLOSURE STATEMENT HAS
BEEN APPROVED FOR THIS PLAN.
NO ACCEPTANCES OR REJECTIONS OF THIS
PLAN MAY BE SOLICITED AT THIS TIME

## ARTICLE VI

## MEANS FOR IMPLEMENTATION OF THE PLAN

6.1.    Continued Corporate Existence.  All of the Debtors will continue to exist after the Effective Date as separate limited liability companies in accordance with the applicable Arizona law and pursuant to their respective articles of organization, operating agreements, and other organizational documents in effect prior to the Effective Date, except to the extent such articles of organization, operating agreements, and other organizational documents are amended pursuant to this Plan.

6.2.    Amended LLC Agreements.  On the Effective Date, or as soon thereafter as is practicable, the operating agreements of all of the Debtors (collectively, the "Amended LLC Agreements") shall be amended as necessary to satisfy the provisions of this Plan and the Bankruptcy Code, including, without limitation, the prohibition against the issuance of non-voting equity securities set forth in section 1123(a)(6) of the Bankruptcy Code.  The forms of Amended LLC Agreements shall be included in the Plan Supplement.  After the Effective Date, the Amended LLC Agreements shall be subject to such further amendments or modifications as may be made by law or pursuant to such Amended LLC Agreements.

6.3.    Formation of NewCo.  NewCo shall be formed on or prior to the Effective Date.  NewCo shall be the holding company for the Reorganized Debtors and shall hold the New Membership Interests to be issued by each Reorganized Debtor.  NewCo shall issue the New Warrants and the New Common Stock, if applicable, on the Effective Date.  NewCo shall be governed pursuant to the NewCo Certificate of Incorporation and the NewCo Bylaws.

6.4.    Exit Financing.  On the Effective Date, without the need for any further action by the directors, officers, stockholders or members of NewCo and each Reorganized Debtor, NewCo and each Reorganized Debtor shall be authorized to enter into the Exit Financing as borrowers and to execute any documents or agreements related thereto, including, without limitation, the New Intercreditor Agreement and any documents required in connection with the creation or perfection of the Liens securing the Exit Financing.  The proceeds of the Exit Financing shall provide the cash needed by the Reorganized Debtors on the Effective Date and shall be used by the Reorganized Debtors to, among other things, fund the operating costs and capital improvements at the Project from and after the Effective Date.

To the extent Credit Suisse and/or affiliates of Credit Suisse solicit interest for exit capital, the Second Lien Lenders will be solicited to provide exit capital for the Reorganized Debtors on the same terms as the First Lien Lenders are solicited.

6.5.    Directors and Officers of NewCo.

(A)    Board of Directors of NewCo.  On the Effective Date, there shall be a five (5) person board of directors of NewCo, comprised of individuals selected and

29

NOTICE: NO DISCLOSURE STATEMENT HAS
BEEN APPROVED FOR THIS PLAN.
NO ACCEPTANCES OR REJECTIONS OF THIS
PLAN MAY BE SOLICITED AT THIS TIME

approved by the First Lien Agent prior to the Confirmation Hearing. If the Plan Proponents pursue the auction process under the Alternative B set forth in Section 6.16 of the Plan and a Person other than the First Lien Lenders is the Acquirer under the auction process, then the Acquirer may select the board of directors. The initial term of the board of directors of NewCo shall be until the first annual meeting of stockholders of NewCo following the second anniversary of the Effective Date. If NewCo is organized as a limited liability company rather than a corporation, all references herein to NewCo's "directors" or "board of directors" shall be deemed references to NewCo's managers or board of managers, respectively.

(B)     Ownership and Management of the Reorganized Debtors. NewCo shall be the sole member of each Reorganized Debtor and shall manage the business and affairs of each Reorganized Debtor in such capacity.

(C)     Officers of NewCo. The initial officers of NewCo shall be disclosed in the Plan Supplement. The selection of officers of NewCo after the Effective Date shall be governed by the NewCo Bylaws.

6.6.     Employee Matters. From and after the Effective Date, NewCo and the Reorganized Debtors shall each have the authority, consistent with the NewCo Certificate of Incorporation, the NewCo Bylaws and the Amended LLC Agreements, to terminate, amend or enter into employment, retirement, indemnification and other agreements with their respective directors, officers and employees and to terminate, amend or implement incentive compensation plans, benefit and retirement plans, and other plans for their respective officers and employees.

The Reorganized Debtors shall retain Richard Sonntag as a key employee for a term of not less than one year from the Effective Date and Mr. Sonntag shall otherwise receive pay and benefits not less than the pay and benefits that he was entitled to receive from the Debtors immediately prior to the Petition Date. Pursuant to section 1129(a)(5)(B) of the Bankruptcy Code, the Plan Proponents shall disclose the nature of any compensation for Mr. Sonntag's services in the Plan Supplement.

The Reorganized Debtors shall retain additional key employees of the Debtors who are not insiders. These non-insider key employees have been identified by the First Lien Agent and the Debtors, and information regarding such key employees shall be shared on a confidential basis with the Committee, the Current Equity Owners, the Second Lien Agent, and potential Acquirers. Such employees shall be employed for a term of not less than six months from the Effective Date with at least one month of severance pay (which pay, in any event, shall continue at least through October 31, 2009) and shall otherwise receive pay and benefits not less than the pay and benefits such employees were entitled to receive from the Debtors immediately prior to the Petition Date. The Reorganized Debtors also shall provide a performance incentive plan and a severance plan for certain employees.

NOTICE: NO DISCLOSURE STATEMENT HAS
BEEN APPROVED FOR THIS PLAN.
NO ACCEPTANCES OR REJECTIONS OF THIS
PLAN MAY BE SOLICITED AT THIS TIME

LAI 1449243v.3